Reverend Negil L. McPHERSON, Sr., Individually and on behalf of Angela Marie McPherson, and Negil Livingston McPherson, Jr., minors, et al.,

v.

SCHOOL DISTRICT # 186, SPRINGFIELD, ILLINOIS and the Board of Education, School District # 186, Springfield, Illinois, et al.

No. S–Civ–74–44.

United States District Court,
S. D. Illinois, S. D.

March 20, 1978.

On Fixing Attorneys' Fees July 31, 1978.

Percy L. Julian, Jr., Madison, Wis., for plaintiffs.

John A. Billington, Billington & Billington, Springfield, Ill., for defendants.

## MEMORANDUM ORDER

ACKERMAN, District Judge.

Presently before me is plaintiff's motion for an award of costs and attorney's fees. The question of whether any amount must be awarded and the question of what is a

reasonable amount have been bifurcated for purposes of hearing. After considering the briefs and oral argument of counsel, I have reached the following conclusions on the initial question of whether any amount must be awarded.

## STATUTORY AUTHORITY

The plaintiffs base their claim upon Section 718 of the Emergency School Aid Act, 20 U.S.C. § 1617[1]; the Civil Rights Attorneys Fees Award Act of 1976, Public Law 94–559[2]; and 28 U.S.C. Section 1920[3] as well as Rule 54, F.R.Civ.P.[4] They are claiming costs, including out-of-pocket expenses, and attorneys' fees for legal services rendered by counsel on behalf of plaintiffs.

The essential elements to plaintiffs' statutory claims are: (1) that there is a final order in this case; (2) that the proceedings were necessary to bring about compliance with the constitutional mandates of non-discriminatory education; (3) that the plaintiffs have been the prevailing parties; and (4) that there are no circumstances properly before this Court rendering such an award unjust.

## ANALYSIS

### I. THERE IS A FINAL ORDER IN THIS CASE

▮ Since the finality of the orders in this case have not been contested, I am not

---

1. Upon the entry of a final order by a Court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this Chapter or for discrimination on the basis of race, color, or national origin in violation of Title VI of the Civil Rights Act of 1964, or the Fourteenth Amendment to the Constitution of the United States as they pertain to elementary and secondary education, the Court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party other than the United States, a reasonable attorneys' fees as part of costs.

2. Revised Statutes Section 722 (42 U.S.C. § 1988) is amended by adding the following: "In any action or proceeding to enforce a provision of Sections 1977, 1978, 1979, 1980 and

1981 of the Revised Statutes, . . . or Title 6 of the Civil Rights Act of 1964, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fees as part of the costs." This statute is hereafter referred to as § 1988; the accompanying Senate Report, No. 94–1011, U.S.Code Cong. & Admin.News 1976, p. 5908, is referred to as § 1988 Senate Report; the accompanying House Report, No. 94–1558, is referred to as § 1988 House Report.

3. This statute allows a Judge or Clerk of any Court of the United States to tax certain fees as costs of the litigation.

4. Subsection d of Rule 54 allows for the imposition of costs which are to be paid to the prevailing party unless the Court directs otherwise.

called upon to construe the language of the statutes. However, the United States Supreme Court in *Bradley v. Richmond School Board*, 416 U.S. 696, 722–23, n. 28, 94 S.Ct. 2006, 2022, 40 L.Ed.2d 476 (1974), said: "[T]he entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees in school desegregation cases." In *Johnson v. Combs*, 471 F.2d 84, 87 (5th Cir. 1972), the Court held that the test for determining finality is appealability under 28 U.S.C. § 1291. See also F.R.Civ.P. 54(a).

Under any of the above tests final orders have obviously issued in this case, including the Consent Decree of December 27, 1974; the rejection of the school district's "Plan for Racial Integration", by Judge Wood's Order of April 2, 1976; and my Memorandum and Order of December 7, 1976, which set forth the desegregation plan currently being implemented.

## II. THESE WERE PROCEEDINGS NECESSARY TO BRING ABOUT COMPLIANCE WITH THE CONSTITUTIONAL MANDATE OF NON–DISCRIMINATORY EDUCATION [5]

■ To decide this question I have reviewed the multitude of pleadings, orders, legal memoranda, and plans submitted by the parties during the nearly four year duration of this lawsuit. On April 11, 1974, this suit was filed under 42 U.S.C. §§ 1981, 1982, 1983, and 1988 alleging, *inter alia*, that "defendants and/or their predecessors have over the years and are at present deliberately and purposefully attempting to create, foster, and maintain racial and ethnic segregation within the School District . . . ." by various enumerated acts set forth. The complaint further alleged that the defendants knew the racially segregated character of the public schools and nevertheless refused and failed to take action to eliminate racial segregation.

On May 16, 1974, the defendants filed a motion to dismiss. In the brief in support of that motion, the defendants stated:

The unique nature of the burden of proof and the factual proof requirements to be met by the plaintiff in a desegregation case make proof of intentional and purposeful acts of individual defendants which rise to a violation of plaintiffs' civil rights impossible in the context of that burden. In short, the very nature of that type of cause of action wherein historical segregation is at issue does not lend itself to individual defendant liability.

However, Judge Wood [6] denied the motion to dismiss on October 4, 1974.

On November 18, 1974, defendants filed an answer to the complaint, denying that they refused or failed to take action which had or will have the effect of eliminating racial segregation. Defendants admitted the existence of racial imbalance in the public schools, but said the racial imbalance was due to housing patterns within the school district and actions of other agencies. Yet, on December 27, 1974, the parties entered into a Consent Decree approved by the Court, in which the defendants admitted that:

---

**5.** This is an explicit requirement of Section 718 of the Educational Amendments of 1972, 20 U.S.C. § 1617. However, the requirement does not appear in the text of the amendment to § 1988. Section 1988 does deter frivolous or vexatious lawsuits by permitting an award of attorneys' fees against a party shown to have litigated in "bad faith" under the guise of enforcing the federal civil rights acts. *See*, § 1988 Senate Report at 6; § 1988 House Report at 6–7.

**6.** Judge Harlington Wood, Jr., was the Federal District Judge for the Southern District of Illinois, Southern Division, at the time this lawsuit was filed. He was the presiding judge over all proceedings in this lawsuit until May 28, 1976, at which time he assumed his duties as a judge of the United States Court of Appeals for the Seventh Circuit. Judge Wood presided over the school board's motion to dismiss, the entry of the Consent Decree and the rejection of the school board's first "Plan for Racial Integration" dated April 28, 1975. Since July 26, 1976, Judge J. Waldo Ackerman has presided over this litigation.

Various actions and omissions of the Board of Education of School District # 186, and of officials of the District, when considered together and cumulatively, have resulted in violations of the Fourteenth Amendment by contributing to the creation, intensification, and perpetuation of racial segregation in and among the public schools of Springfield School District # 186 not limited to any physically or otherwise separable portion of the district. Defendants have an affirmative obligation to eliminate and prevent racial segregation in the public schools of District # 186.

By order of April 2, 1976, Judge Harlington Wood, Jr., rejected the school board's first "Plan for Racial Integration". In his Memorandum Opinion Judge Wood found that:

The whole point and purpose of this lawsuit and the Consent Decree is to remedy the fully admitted constitutional violations, which the Plan does not adequately do. The constitutional problems do not arise simply from the lack of innovative school programs. No litigation is needed to approve the curriculum. The Plan submitted can be briefly described as part-way, part-time. The basic fault of the Plan is reflected in the answer of a board official who was asked on cross-examination during the hearings, "Did you make any determination as to whether pupils of all grades should be assigned in such a way that as nearly as practical each attendance center serving a particular grade level has about the same racial and ethnic composition?" This question in a general way tracks the requirement in paragraph # 4 of the Consent Decree. The candid response was that in drafting the Plan that particular criteria was "very low on the totem pole". The Plan reflects this view and thus fails to meet all the criteria of the Consent Decree.

Both plaintiffs and defendants then submitted plans for desegregating the Springfield schools, and I adopted what was con-

sidered to be the best of both plans for achieving the desired goal.[7] Due to the hard work of the Citizens Monitoring Commission, as well as the efforts of the educators, students, and general public, the plan is being successfully implemented. It is commendable that the City of Springfield, once the integration plan passed constitutional scrutiny and became the order of the Court, responded in an understanding, positive and orderly way.

In view of the foregoing history, I cannot accept defendants' present position that "a comprehensive plan of integration for the Springfield Public Schools of District # 186 would have come into being in an orderly fashion and in a timely manner without the initiation of formal judicial proceedings by plaintiffs and without the personal involvements of plaintiffs' counsel." While the filing of the lawsuit forestalled the Springfield school board's actions from obtaining a natural progression, and thus I can only deal with what might have been, there is no support for defendants' contention in the record. I would agree with plaintiffs that there is some support for the contention that exactly the opposite is true. The question of what actions the school board affirmatively did to foster or promote segregation are blurred by a vague admission in the Consent Decree. However, the issue of what the school board did not do in meeting the constitutional mandates of *Brown v. Board of Education* and its progeny, following their admission of constitutional violations and a duty to correct them, are somewhat clearer from the record. Only after this litigation was commenced did the defendants put forth a comprehensive plan to achieve racial integration, and that plan was rejected as constitutionally inadequate. After another attempt by the School District and a proposal also submitted by the plaintiffs a workable school integration plan was finally achieved. In view of all the factors in this lawsuit, while I cannot say positively that defendants' position is entirely without merit, I can say that plain-

---

7. This Memorandum Order is published at 426 F.Supp. 173.

tiffs' activities were not unnecessary. Plaintiffs' vigorous action in this lawsuit have played a significant role in forcing the board to openly admit to the segregation within the public schools and take steps towards remedying these constitutional infirmities. Through their persistence, plaintiffs not only successfully challenged the first proposed plan for integration, but significantly aided the plan eventually accepted through submission of their own plans, and scrutiny of the board's proposals.

Defendants' arguments here also seem to be based upon whether the activities of the defendants as alleged in the initial complaint in this proceeding would violate the "intent or purpose to racially discriminate test" enunciated in several recent Supreme Court opinions.[8] Once again defendants are attempting to force me to speculate in what might have been. Despite the fact that they knowingly and intentionally waived their right to trial on this and other issues by entering the Consent Decree in which they admitted violations of the Fourteenth Amendment by actions and omissions which contributed to the creation, intensification, and perpetuation of racial segregation, they now wish this Court to find that no problems really existed. The school board did not appeal the Consent Decree Order or the order rejecting their initial plan for school integration which was found inadequate. I cannot say whether defendants would have prevailed under evolving constitutional standards. However, based on what did occur, I must conclude that this action was necessary to vindicate violations of constitutional rights as defined at the inception of the suit. The Consent Decree mooted any later analysis as to what could or could not have been proven.

■ Finally, the suggestion that the plaintiffs were needlessly intermeddling be-

cause any complaints they had were actionable by the Attorney General is unpersuasive. Plaintiffs had available the remedy of court action for alleged violations of their constitutional rights and no exhaustion of alternative remedies is required.

## III. PLAINTIFFS ARE "PREVAILING PARTIES" FOR PURPOSES OF THE ATTORNEYS' FEES STATUTES

■ I agree with the plaintiffs that they do not have to prevail on every issue and it would not be proper nor reasonably possible for this Court to review the entire litigation and decide who was the "victor" in each individual issue. From my review of the record, infra, and the totality of the circumstances, I can only conclude that plaintiffs are prevailing parties in the sense required for recovery of attorneys' fees under the statutes in question.[9]

Both the Consent Decree, and to the extent their participation aided the decision, the rejection of the initial plan, can be seen as successful accomplishment by plaintiffs of the goals which they set out to achieve. Plaintiffs had a great impact, both through adoption of their proposals and intense scrutiny and criticism of the defendants' proposals, on the school integration plan which was eventually adopted.

## IV. THERE ARE NO CIRCUMSTANCES PROPERLY BEFORE THE COURT WHICH RENDERS SUCH AN AWARD UNJUST

■ As stated in the Senate Report accompanying the Civil Rights Attorneys' Fees Awards Act, a party seeking to enforce the rights protected by the statutes covered by this statute if successful, "should ordinarily recover an attorneys' fee unless special circumstances would render

8. The notion is that if the school board had contested the complaint that during the years of proceedings the status of the law would have evolved so that any actions of the Board could not have been considered unconstitutional.

9. It is clear that in suits such as this settled by voluntary agreement rather than litigation, the

plaintiffs can be considered "prevailing parties" for purposes of an award of attorneys' fees, at least under Section 1988. See *Brown v. Culpepper*, 559 F.2d 274 (5th Cir. 1977). § 1988 Senate Report at p. 5; § 1988 House Report at p. 7.

such an award unjust." *See, Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *Northcross v. Memphis Board of Education*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). The Committee Notes indicate that one case in which attorneys' fees should not be granted is where the suit was clearly frivolous, vexatious or brought for harassment purposes. There is no provision in any of the statutes for denying liability on the inability of the defendant to pay. The § 1988 House Report at 7 said: "The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities." The inability to pay may effect only the time over which payments of fee award may be spread or the amount of interest to be charged on such deferred payments.

While I am not unmindful of the critical financial difficulties which the Springfield School District finds itself, I must follow the mandates of the United States Congress and apply the legislation in such a way as to further the goals which they set forth. Once again referring to the Congressional Statement accompanying the amendment to Section 1988, it was stated:

> There are very few provisions in our federal laws which are self-executing. Enforcement of the laws depends on governmental action and, in some cases, on private action through the courts. If the cost of private enforcement actions becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

Since I cannot find anything in the present case which would permit me to overcome the presumption of awarding attorneys' fees, I have no alternative and must exercise my discretion in favor of such an award.

## V. CONCLUSION

Since the plaintiffs have met each of the statutory requirements, I must find that they are entitled to a reasonable attorneys' fee. A hearing will be held on Friday, May 5, 1978, at 9:30 a. m., at Springfield, Illinois to hear any evidence which the parties wish to present on the question of what is a reasonable amount which plaintiffs' attorneys should receive.

## ON FIXING ATTORNEYS' FEES

It is clear that plaintiffs' counsel are entitled by law to an award of reasonable attorneys' fees and costs. (See Order of March 20, 1978). This Court is now faced with the difficult task of fixing an amount by applying the binding legal principles for such awards against the background facts and circumstances of this case.

Plaintiffs' counsel performed a multitude of different services during the more than four years this litigation has continued. To maintain a perspective on the attorneys' roles during this proceeding I have divided the case into several phases:

Phase 1 begins on November 2, 1973, with Mr. Julian's initial investigation into the possibility of a lawsuit to compel Springfield School District # 186 to comply with constitutional mandates of school desegregation. During this phase Mr. Julian conducted extensive legal research and factual investigation, drafted and filed the complaint, responded to defendant's motion to dismiss, engaged in discovery processes, and negotiated a Consent Decree. This phase ends on December 27, 1974, when less than nine months after the filing of plaintiffs' complaint the School District agreed to a Consent Decree. Unlike other cases of which the Court is aware, the issue of whether constitutional infirmities existed was settled and did not require countless arguments and rearguments through this and the appellate courts. Rather, no appeals were taken and the attention of Phase 2 was on an appropriate plan to bring the school district within constitutional mandates. Mr. Percy Julian has billed a total of

334.54 hours for his time in Phase 1. Mr. Norman Chachkin devoted 52.61 hours for which he seeks payment. All of the proceedings in Phase 1 were during the tenure of my predecessor, Judge Harlington Wood, Jr.

Phase 2 begins on December 28, 1974, and extends until the school desegregation plan order was entered by this Court on December 7, 1976. During this remedy phase, plaintiffs' counsels' role was as negotiator and drafter of proposed desegregation plans. Although the burden of developing an acceptable plan was on the defendant School District, Mr. Julian's firm provided a necessary adversarial nature to the proceedings, both objecting to infirmities on the Board's plan and offering counterproposals on behalf of the plaintiffs. Judge Wood rejected the School District's initial plan for racial integration by Order dated April 2, 1976. I inherited this case following Judge Wood's appointment to the Court of Appeals for the Seventh Circuit and my confirmation in July, 1976, to succeed him as United States District Judge.

Plaintiffs' and defendants' counsel were impressive during an extensive week long hearing held regarding the plan in late September. Plaintiffs' counsel, through oral argument, well-prepared memoranda and effective utilization of experts, allowed plaintiffs' positions to be of much assistance to the Court in preparing the desegregation plan order entered in December of 1976. A total of 786.59 hours were billed for work performed by Mr. Julian and his associates, Ms. Daphne Webb and Mr. Jeff Scott Olson. Mr. Chachkin rendered 6.85 hours of work during this phase.

Phase 3 begins December 8, 1976, and extends until June 8, 1978, the date of the latest supplementation of fees and costs by Mr. Julian's firm. During this phase plaintiffs' counsel were monitoring the effectiveness of the plan in meeting its intended goals and assisting the plaintiffs in resolution of small problems which developed.

The bulk of the billable hours during this phase, 148.17 out of 204.09 hours, was in preparation and presentation of the motion for attorney's fees. Mr. Chachkin had no billable hours during this phase.

 With this general overview of the proceedings and plaintiffs' counsels' participation therein, I caused to be researched the standards applicable to a fee award. Congress, in committee reports on the legislation providing for the award of attorney's fees * in civil rights cases, has set forth some criteria for the trial judge to use in determining a "reasonable" fee. The amount of the fee is to be governed by the same standards which prevail in the other types of complex federal litigation, such as antitrust cases. Opinions cited as setting forth and applying the legal standards are *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974); *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444 (C.D.Cal.1974); *Stanford Daily v. Zurcher*, 64 F.R.D. 483 (N.D.Cal.1974) and *Swann v. Charlotte-Mecklenburg Board of Ed.*, 66 F.R.D. 483 (W.D.N.C.1975). See also *Waters v. Wisconsin Steel Works of International Harvester*, 502 F.2d 1309 (7th Cir. 1974). These standards were thought to have "resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." The Court in *Johnson* cogently states that there is no duty to make counsel for the prevailing party rich. These standards were not passed for the benefit of attorneys, but to enable litigants to obtain counsel to preserve rights secured by the Constitution or laws of the United States.

Several factors make the judicial determination of reasonable fees very difficult in cases such as the one before me. First, legal fees are usually a matter of contract between lawyer and client subject only to judicial review where there is an alleged breach or unconscionability. But the plaintiffs in this case entered no contract defining a fee agreement and the record is de-

---

* See, House Report No. 94–1558 and Senate Report No. 94–1011, Civil Rights Attorneys' Fees Awards Act, 42 U.S.C. § 1988, as amended.

void of any agreements concerning payment. An after-the-fact valuation of four years of legal service thus replaces any notion of what would have been considered a reasonable fee in the minds of the parties at formation of the lawyer-client relationship.

Also present is the requirement of fee shifting. That is, defendants are being required to pay a fee to an attorney with whom they had no relationship except adversarial. There were obviously no rights in defendants to control or even monitor the actions, expenses, or fees of plaintiffs' counsel.

Further, it cannot be ignored that defendant is a public body and a fee award is essentially reallocating a portion of the property tax area residents pay towards furthering the educational process. In view of the relevant legislation, I am not free to decide that it better benefits the students to spend money on books and teachers than paying attorneys' fees. Rather it is incumbent on me to scrutinize plaintiffs' fee request to assure the public is not overcharged. At the same time I must fix a fee that reasonably compensates plaintiffs' attorneys.

What is reasonable in a given case depends upon one's perspective. Even my "objective" opinion is subjective to the extent it reflects how one judge resolves the competing claims in arriving at a "reasonable" amount of dollars. Neither plaintiffs' counsel nor the defendants have been successful on all points raised on the fees issue. With all the considerations previously set forth in mind, I have arrived at a base fee and then considered the other adjustment standards to reach an amount which fulfills the statutory purpose.

*Base Fee*

1. Billable Hours

A logical starting point in fee computation is to determine the amount of time expended, measured in hours, and the appropriate hourly rate. Mr. Julian has filed detailed statements and affidavits setting forth the dates, amount of time, and activities he and his associates spent on this case. No evidence presented has cast doubt on the validity of these representations and I must accept them as an accurate compilation of total hours spent. It is also noted that no fees were claimed for paralegal and law clerk assistance.

In determining the amount of billable hours for which payment should be allowed I have scrutinized the itemized time expenditures to determine whether they were reasonable for the work performed and not unnecessary or duplicitous. The defendants vigorously contest time billed for what they perceive as training of associates, time spent in travel and some daily hourly billings they view as excessive.

A. Associates Hours

Generally, the use of associates to draft pleadings with continuing supervision and final approval by an experienced attorney, is a fee reducing measure which should be encouraged. It is economical for the client because the hourly rate is that of the associate, which is lower than the senior attorney. The savings disappear, however, if the associate's lack of experience requires an unreasonable amount of hours to achieve a satisfactory result.

I have reviewed the hours billed for Ms. Webb, Ms. Crandall and Mr. Olson and cannot conclude that their time was unnecessary or duplicitous. Both Ms. Webb and Ms. Crandall participated in hearings before this Court and conducted themselves capably and in a professional manner. All three of the associates were genuinely involved and participated in the case. While all young attorneys are, in a sense, training while working on every project assigned, it is only as a byproduct of the experience gained by the type of legal work performed. All of their hours billed should be compensated.

B. Travel Time

Defendants contend that none of the travel time from Madison, Wisconsin, to

Springfield or elsewhere should be compensated. There is approximately 265 hours of travel time billed, around 204 for Mr. Julian and 53 for his associates. Mr. Chachkin billed for approximately 8 hours of travel time.

■ The fee statute clearly intends for an attorney to be compensated for all time reasonably spent on the case. This follows from the fact that a lawyer's time is his stock in trade. Mr. Julian states in his affidavit that he was working on the case while commuting. Even if he were not, an argument can be made that an attorney should be compensated for travel time since he must be away from the office and cannot utilize the time for other billable matters.

The two questions involving travel time are: (1) should all of the hours be compensated and (2) should the rate be the same as for time spent on other legal matters.

Key to the first travel time issue is whether "commuting" travel should be compensated at all and, if so, whether the amount of time spent is reasonable. This in turn depends upon whether it was reasonable for plaintiffs to obtain out-of-state counsel when it was obvious that every time he had to investigate or appear in court there would be approximately 8 hours of travel time involved.

It has not been shown whether any local attorney of Mr. Julian's ability would have accepted this case although affidavits support the fact that several were never approached and were available. Apparently some members of the plaintiffs' class contacted the NAACP Legal Defense Fund (L.D.F.) which put them in touch with Mr. Julian, an L.D.F. cooperating attorney, practicing in Madison, Wisconsin. Certainly, Mr. Julian realized a considerable portion of his representation would require commuting to Springfield. He and his associates made a total of 33 trips, 29 of which were to Springfield. The total amount of travel time claimed is as follows:

| | Phase I | Phase II | Phase III |
|---|---|---|---|
| Mr. Chachkin | 8 hrs. | 0 | 0 |
| Mr. Julian | 72 hrs. | 76.4 hrs. | 56 hrs. |
| Ms. Webb | 0 | 36.5 hrs. | 0 |
| Mr. Olson | 0 | 7.0 hrs. | 0 |
| Ms. Crandall | 0 | 0 | 9.25 hrs. |
| | 79 hrs. | 19.9 hrs. | 65.25 hrs. |

I can find no authority which supports a denial of the commuting hours to Springfield solely because counsel is from a somewhat distant location. The test must be reasonableness. In view of all the facts and circumstances in this case the commuting hours will be compensated as well as travel time to cities other than Springfield. However, for the reasons set forth in the following paragraph, the travel time will be compensated at a lower rate.

In my opinion time spent travelling should not be compensated at the same hourly rate as office or court time. Efficiency is decreased and many times the circumstances allow little if any productive effort. *Keys v. School Dist. No. 1, Denver, Colo.*, 439 F.Supp. 393, 409 (D.Colo.1977). While a general discussion of hourly rates will appear in a later section, I believe only $40 per hour for travel time of Mr. Julian and Mr. Chachkin is reasonable. Ms. Webb, Mr. Olson and Ms. Crandall will receive $25 per hour for travel time.

### C. Number of Hours Billed

During several stages of the case, and particularly while Mr. Julian and his associates were in Springfield, they usually worked long hours as reflected in their time statements. There is no evidence refuting Mr. Julian's affidavit regarding the number of hours worked on particular days. The 12 hour duplication error of September 2, 1975, has been deducted.

I have further compared the total number of hours billed the defendants for work by their attorneys on this case. Plaintiffs analyzed all of the bills submitted by defendants' counsel and amounts paid by the School District through December 19, 1977. Their exhibits reflected the following:

| Attorney | Hours | Fee | Expenses | Total |
|---|---|---|---|---|
| Mr. Grummon | 1173.62 (est.) | 46,278.26 | 1,823.66 | 48,101.92 |
| Mr. Winning | 525. (est.) | 23,270.00 | 340.71 | 23,610.71 |
| Mr. Billington | 44. (est.) | 1,980.00 | — | 1,980.00 |
| Total | 1742.62 | $71,528.26 | $2,164.37 | $73,692.63 |

Also a number of School District # 186 administrative and clerical personnel devoted extensive time on matters in this case. Their salaries would have to be included with the attorneys' fees and costs to arrive at the total amount paid by the district for the defense of this case.

In comparison are the total number of hours of plaintiffs' attorneys through June 8, 1978 (including travel time):

| Attorney | Hours | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|---|
| Mr. Chachkin | 59.46 | 52.61 | 6.85 | 0 |
| Mr. Julian | 1040.42 | 334.54 | 525.24 | 180.64 |
| Ms. Webb | 227.00 | 0 | 226.80 | 0.20 |
| Mr. Olson | 35.55 | 0 | 34.55 | 1. |
| Ms. Crandall | 22.25 | 0 | 0 | 22.25 |
| Totals | 1384.68 | 387.15 | 793.44 | 204.09 |

■ After reviewing the amount and types of services billed by the defendants' counsel, it reaffirms my independent conclusion that the 1,384.68 hours billed by plaintiffs' counsel through June 8, 1978, is not unreasonable since that is less time than the approximately 1742.62 hours the School Board's attorneys charged for the same case through December 19, 1977.

### D. Attorneys' Fee Motion

Of concern is the amount of time spent on the attorneys' fees issue. Mr. Julian spent 124.92 out of his 180.64 hours in Phase 3 in the fees issue. Mr. Olson spent 1 hour on the fee issue and Ms. Crandall spent 22.25 hours. This is a total of 148.17 hours, approximately the same amount of time spent on investigating, preparing and filing the complaint in this case.

An argument can be made that these hours did not benefit anyone other than the plaintiffs' attorneys. Phases 1 and 2 had exposed the constitutional infirmities and devised a remedy, the objectives sought by plaintiffs. On the other hand these and other plaintiffs benefit by attorneys receiving their reasonable fees under the statutes. Congress intended that attorneys who undertake to vindicate constitutional violations and prevail should have the incentive of knowing they will be paid. This is particularly important where, as here, the plaintiffs as a class could not afford to pay the fee and the plaintiffs' attorney was willing to accept the case anyway.

Over 50 hours (27.75 hours of which were travel time) of Phase 3 were consumed with questions and problems which arose during the implementation of the plan. These hours clearly inured to the plaintiffs' benefit.

■ After carefully evaluating the policy factors of the Civil Rights Attorneys' Fees Awards Act, I have concluded that work on the fee issue should be compensated. All of Mr. Julian's briefs and argument were relevant and helpful to the Court's decisions on the fee issue. It would appear anomalous to penalize an attorney for being too thorough in his research and presentation of a legal issue. However, I must say that in this case the total amount of time billed for the attorneys fees motion cannot be found reasonable or compensable, particularly since I would have reached many of the same conclusions with much less involvement by counsel. As an attorney who has extensive practice in the civil rights area, Mr. Julian will often have occasion to use the massive research he has compiled on

the 1976 Civil Rights Attorneys Fees Act. But his Fees Act expertise cannot be entire-ly at the expense of School District # 186. The following hours will be allowed:

| | Requested | | Allowed | |
|---|---|---|---|---|
| Attorney | Office or Court Time | Travel re Fees Motion | Office or Court Time | Travel re Fees Motion |
| Mr. Julian | 89.67 | 35.25 | 50 | 25 |
| Mr. Olson | 1 | 0 | 1 | 0 |
| Ms. Crandall | 13 | .9.25 | 13 | 9.25 |

## 2. Hourly Rate

In determining what a reasonable hourly rate should be, I have considered the experience, reputation and ability of the attorneys and the customary fee for complex litigation by those of comparable abilities.

 There are no controlling guidelines that have been cited as to the locale governing the customary rate; i. e., a national average, the rates in Madison, Wisconsin, where Mr. Julian practices or in New York where Mr. Chachkin practices, or the rates in Springfield where the suit originated and was tried.

In my opinion, the base fee factor customary rate should be that in Springfield. Any difference between that rate and Mr. Julian's normal rate will be considered in the adjustment factors. The current average hourly rate in Springfield for complex federal litigation is $50 per hour for experienced attorneys comparable in ability to Mr. Julian, and $40 per hour for junior attorneys, such as Ms. Webb, Mr. Olson, and Ms. Crandall. An attorney of Mr. Chachkin's national reputation should receive $60 per hour for advisory participation in his spe-cialty. It should be pointed out that fees are generally a matter of agreement between attorney and client on a case-by-case basis. Fees may vary large amounts depending upon certain adjustment factors which will be considered. The base rate is merely the normal fee which an attorney or firm must charge to meet overhead and return a profit.

The attorneys here are being compensated for past services at current rates in order to account for two factors: first, rising overhead and expenses have forced attorneys to increase their fees over the past four years and second, increasing inflation has reduced the purchasing power of the dollars earned in a prior year but not received until the present.

Reference can be made to the chart on page 10 of this opinion which sets forth the total number of hours billed per phase by the plaintiffs' attorneys. They requested an hourly base rate of $100 per hour for Mr. Julian and Mr. Chachkin and $75 per hour for Ms. Webb, Mr. Olson, and Ms. Crandall. The following are charts summarizing the hours and rate allowed each attorney as a base rate computation.

### Chart 1—BREAKDOWN OF HOURS BILLED

| Attorney | Travel Time Phases | | | Work on Atty. Fees Motion Phases | | | Office and Court Work Phases | | | Total Phases | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 |
| Mr. Chachkin | 8 | 0 | 0 | 0 | 0 | 0 | 44.61 | 6.85 | 0 | 52.61 | 6.85 | 0 |
| Mr. Julian | 72 | 76.4 | 56.0 ** | 0 | 0 | 89.67 | 262.54 | 448.84 | 34.97 | 334.54 | 525.24 | 180.64 |
| Ms. Webb | 0 | 36.5 | 0 | 0 | 0 | 0 | 0 | 190.30 | .20 | 0 | 226.80 | 0.20 |
| Mr. Olson | 0 | 7.0 | 0 | 0 | 0 | 1. | 0 | 27.55 | 0 | 0 | 34.55 | 1. |
| Ms. Crandall | 0 | 0 | 9.25 *** | 0 | 0 | 13. | 0 | 0 | 0 | 0 | 0 | 22.25 |

** 35.25 hours of Mr. Julian's travel time was related to work on attorneys' fees.

*** All of Ms. Crandall's travel time was related to work on attorneys' fees.

### Chart 2—Hourly Base Rates

| | Non-Travel | | Travel | |
|---|---|---|---|---|
| | Requested | Allowed | Requested | Allowed |
| Mr. Chachkin | $100 | $60 | $100 | $40 |
| Mr. Julian | $100 | $50 | $100 | $40 |
| Ms. Webb | $75 | $40 | $75 | $30 |
| Mr. Olson | $75 | $40 | $75 | $30 |
| Ms. Crandall | $75 | $40 | $75 | $30 |

### Chart 3—Base Rate Computation

Mr. Chachkin:

| 56.46 hrs. x $60.00 = | $3,087.60 (office) |
|---|---|
| 8 hrs. x $40.00 = | 320.00 (travel time) |
| Total | $3,407.60 |

Mr. Julian:

| 746.35 hrs. x $50.00 = | 37,317.50 (office and courtroom) |
|---|---|
| 50 hrs. x $50.00 = | 2,500.00 (attorney fees motion) |
| 194.15 hrs. x $40.00 = | 7,766.00 (travel time) **** |
| Total | $47,583.50 |

**** Only 25 hours travel time on attorney's fees motion allowed.

Ms. Webb:

| 190.50 hrs. x $40.00 = | 7,620.00 (office and courtroom) |
|---|---|
| 36.5 hrs. x $25.00 = | 912.50 (travel time) |
| Total | 8,532.50 |

Mr. Olson:

| 27.55 hrs. x $40.00 = | 1,102.00 (office and courtroom) |
|---|---|
| 7.00 hrs. x $25.00 = | 175.00 (travel time) |
| 1 hr. x $40.00 = | 40.00 (attorney fees motion) |
| Total | 1,317.00 |

Ms. Crandall:

| 13 hrs. x $40.00 = | $520.00 (attorney fees motion) |
|---|---|
| 9.25 hrs. x $25.00 = | 231.25 (travel time re fees) |
| Total | $751.25 |

---

*Adjustment Factors*

The matter of a reasonable fee is not decided merely by multiplying attorney's hours and typical hourly fees. Certain adjustment factors must be considered which may result in an adjustment up or down of the base fee. *Waters, supra* at 1322.

These factors personalize the award, making the Court take cognizance of the uniqueness of this particular case and the effect on the plaintiffs' attorney's practice. Included is the attorneys' relation with their clients and the Court and the degree of skill exercised in satisfying their clients' legal needs.

The principal attorney for the plaintiffs was Mr. Julian. Mr. Chachkin merely provided advisory legal assistance at various stages and Ms. Webb, Mr. Olson, and Ms. Crandall basically relieved Mr. Julian of some preliminary drafting, research and examination. At all times the responsibility for plaintiffs' case remained with Mr. Julian. For this reason, primary application of the adjustment factors centers on him.

One factor to be considered is the fee basis on which plaintiffs' counsel accepted

the case. Mr. Julian was a cooperating attorney for the NAACP Legal Defense & Educational Fund. That fund reimbursed Mr. Julian for some of his expenses and per diems. This funding, however, is intended only to assist attorneys to undertake pro bono publico cases without encountering devastating financial difficulty. Nothing approaching a normal hourly fee will be received unless the plaintiff prevails and becomes so entitled under one of the fees statutes. Thus it is conceivable a case such as this could go on for years and plaintiffs' attorneys would never be entitled to a fee. In contrast, the School Board's attorneys received their fees regardless of the outcome. Those fees were paid promptly as billed. The contingency factor is not as prevalent in this case as others due to the early settlement on the constitutional violation issue. After that point, early in these proceedings, plaintiffs were established as prevailing parties and while plaintiffs' counsel had to continue to assist the Court in order to deserve fees, the risk of going unpaid was slight after Phase 1.

Another factor is the effect of this case on Mr. Julian's practice. Mr. Julian has developed his practice by accepting such public interest cases and the nature of this case did not disrupt his firm as much as it may have a firm not accustomed to such cases. By successfully presenting the plaintiffs' case in this difficult proceeding, he has undoubtedly increased, rather than decreased, the reputation of himself and his firm. Although this was his first "school" case, Mr. Julian performed extremely well and the experience gained here was valuable in developing expertise in such matters.

Obviously if Mr. Julian had not accepted this case he could have used his 1040.42 hours on other fee generating matters. There are affidavits on file which indicate the hourly rate in the area where Mr. Julian's firm is located, Madison, Wisconsin, is somewhat higher than Springfield. As discussed earlier, I do not think the attorney's own rate is controlling, but this is a factor to consider.

A critical factor in any adjustment is the disruption of the attorney's practice by the case. From November 2, 1973, until June 8, 1978 (approximately 1,205 working days) Mr. Julian devoted over one hour on this case on the following amount of days:

| Hours Spent | No. of Work Days |
| --- | --- |
| 1–5 | 103 |
| 6–10 | 69 |
| 11–15 | 14 |

Less than one hour was spent on the case on numerous other working days. While he could and presumably did perform work on numerous other cases during this time period, this case constituted about 1/10th of his caseload. To be fair it should be pointed out that the time was not evenly distributed over the years and in order to meet Court schedules for filings and hearings Mr. Julian had to devote himself almost exclusively to this case during several periods of the proceedings.

Another factor to be considered is Mr. Julian's relations with his clients and the Court. It should be remembered that this is a class action in which Mr. Julian represented 112 named plaintiffs as well as all other school children within District 186 or eligible to attend schools within School District 186 who attend segregated or substantially segregated schools and who may receive unequal educational opportunities. With this large group of persons for his client, Mr. Julian had to spend a great deal of time communicating with them regarding the case. From observation it appears the plaintiffs were satisfied with Mr. Julian's services and support him in his fee requests. Mr. Julian has been punctual in meeting his obligations to the Court and has served his clients in a competent and professional manner.

After considering all of these factors, as well as the public importance of the case, I have concluded that Mr. Julian is entitled to an upward adjustment of $20 per hour for 262.54 hours of Phase I (excludes travel time). This amount is necessary to make the total award reasonable within the in-

tent of the fee statute. All other amounts will remain the same as the base fee computation in Chart 3, p. 761, *supra*.

It should be noted that this is an adjustment to the hourly rate which makes it reasonable in view of the circumstances in this case. Plaintiffs' attorneys urge that a multiplier is necessary and appropriate to arrive at just compensation. But I am persuaded by the recent opinion of the Sixth Circuit which held that allowing a multiplier in school desegregation cases seeking injunctive relief is without statutory authority. *Oliver, et al. v. Kalamazoo Bd. of Ed., et al.*, 576 F.2d 714 (6th Cir. 1978).

Also relevant is that this total amount is in line with the amounts paid counsel hired by the School Board. (See Page 758 *supra*.) The actual outlay by the District was even higher if the time spent by administrative and clerical personnel assisting defense counsel is included.

### Costs

In addition to attorneys' fees, the plaintiffs' attorneys are seeking to have their out-of-pocket expenses assessed against the defendants as costs. Such an award is provided for in the Civil Rights Attorneys Fees Awards Act, *see Brown v. Culpepper,* 559 F.2d 274 (5th Cir. 1977), and is consistent with the purposes of the Act.

A. Expenditures of Julian and Associates, S. C.

A compilation of Mr. Julian's expenses reveals the following expenditures through June 8, 1978:

| Phase | Total | No. of Entries |
|-------|-------|----------------|
| 1 | $ 2,101.15 | 106 |
| 2 | $ 8,223.39 | 127 |
| 3 | $ 6,584.06 | 109 |
| | $16,908.60 | 342 |

Since allowance of these costs is mandated provided they are reasonable, my function has been to review each entry to determine if it appears to be proper and necessary to the case.

A large portion of the expenses are directly attributable to the fact plaintiffs' attorneys were from out-of-town. Transportation, food, and lodging expense for Springfield trips amounted to $1,052.32 in Phase 1, $3,559.80 in Phase 2, and $1,858.94 in Phase 3, totaling $6,461.06. In addition, $2,099.20 in long distance telephone calls were required, $158.93 during Phase 1, $892.37 on Phase 2, and $1,206.83 in Phase 3.

I come back to the question posed earlier involving travel time: how distant may the plaintiff go in obtaining counsel before expenses and travel time are too unreasonable to allow assessment. Neither the letter nor spirit of the Attorneys Fees Act requires plaintiffs to hire the cheapest, closest attorney or take every cost-cutting step to mitigate attorneys fees. Before there is even an entitlement to fees, the plaintiffs must be prevailing parties. Therefore counsel must be competent and make every reasonable effort to formulate the case and present it to the Court. However, the intent of the Act is to attract competent counsel to protect constitutional rights. The perimeters of "reasonableness" prevent a plaintiff from going anywhere in the country obtaining the most expert and expensive attorney available. Plaintiffs in this case have approached, but not exceeded, the bounds of reasonableness.

In the context of this costs award some of the entries are excessive and others are questionable. If there was prior court approval or a showing of necessity the amounts may have been compensable, but all that was before me was the general type of expenditure and the amount. In my opinion a reasonable amount for the travel and phone costs is $7,276.26 which reflects a deduction of 15% ($1,284.00) as excess.

The other expenses, totaling $8,348.34, will be allowed. These costs included postage, Xeroxing, travel other than to Springfield, transcripts, maps and depositions.

Mr. Julian's firm is thus allowed a total of $15,624.60 in costs.

## B. Expenditures of NAACP Legal Defense and Educational Fund

The expenses of the L.D.F. are for Mr. Chachkin's trip to Springfield ($317.37) and travel expenses and expert fees of Dr. Gordon Foster ($9,062.58) and Dr. Michael Stolee ($2,927.39). Also included are expenses and services of William D. Lamson ($994.50), who produced maps of the district.

I will allow all of Mr. Chachkin's expenses, and Mr. Lamson's fees and expenses. However, one aspect of the billing for the experts, Foster and Stolee, is inappropriate. Mr. Stolee wrote in his statement to the L.D.F. on November 9, 1976: "You will notice that I am billing at the rate of $300 per day for fees with $150 payable immediately and $150 deferred. The second $150 will be payable if and when the school board is assessed the costs of the action.

In Mr. Foster's billings to L.D.F. he allowed a 50% commercial discount off his normal $300 per day consulting fee.

█ Thus, Mr. Foster actually charged and was paid $3,450 for his services and Mr. Stolee was paid $1,200. In the statements presented to the Court the experts' hours are presented in their full hourly rate for both experts, $6,900 for Mr. Foster and $2,400 for Mr. Stolee. This type of contingent fee arrangement with an expert is not permissible. See, e. g., A.B.A. Code of Professional Responsibility, DR 3–102; *Keyes v. School Dist. No. 1, Denver, Colo.,* 439 F.Supp. 393, 419 (D.Colo.1977). It would not be appropriate to award as "expenses" or costs of litigation, sums which were never paid as expenses or costs. Thus, only $3,450 will be allowed in fees for Dr. Foster and $1,200 in fees for Dr. Stolee. All of their expenses will be allowed, $527.39 for Dr. Stolee and $2,162.58 for Dr. Foster.

A total of $8,651.84 will be allowed the NAACP Legal Defense and Educational Fund for their expenditures in this case.

## Summary

The law is clear that plaintiffs' attorneys are entitled to reasonable attorneys' fees in this case. Determining the amount is indeed a difficult task. I must find an amount that is adequate compensation for unusually capable counsel. At the same time I cannot be unmindful of the financial needs of the Springfield School District in times when all available funds are badly needed to provide a quality education for its students.

After very careful consideration of the arguments made by Mr. Julian and Mr. Billington, I have concluded that the following attorneys' fees within the circumstances of this case are reasonable and will be allowed:

| Julian and Associates, S.C. | |
|---|---:|
| Mr. Percy Julian | $52,834.30 |
| Ms. Daphne Webb | 8,532.50 |
| Mr. Jeff Scott Olson | 1,317.00 |
| Ms. Sarah Furey Crandall | 751.25 |
| Mr. Norman Chachkin | 3,407.60 |
| Total | $66,842.65 |

Reimbursement for advanced costs are payable as follows:

| | |
|---|---:|
| NAACP Legal Defense Fund | 8,651.84 |
| Julian and Associates, S.C. | 15,624.60 |

In arriving at this award I have used the hourly rate of $70 per hour for lead counsel until the consent decree was entered. During this period the outcome was uncertain and the fee was therefore contingent. Thereafter the hourly rate of $50 per hour ($40 for assistant counsel), the normal rate for complex litigation in the Springfield area, was used. However, I have reduced the rate to $40 per hour ($25 for assistant counsel) for travel time. The number of hours requested for work on the attorneys' fees question was also reduced.

Although plaintiffs' attorney has urged it, a multiplier of the hourly rate has not been used for it is my opinion that such is not permitted by the federal statute mandating an award to plaintiffs of attorneys' fees and costs in civil rights litigation and it

is not necessary to reach a reasonable amount in this case. In arriving at the cost award I have reduced by 15% certain costs as submitted and disallowed contingent fee requests by the plaintiffs' expert witnesses. I have also provided for payment by the school district over a period of two years.

### Payment

Mr. Chachkin and the NAACP Legal Defense Fund shall be paid in full on or before December 31, 1978. The amount of fees and costs owed Julian and Associates, S.C., will be payable in semiannual installments over the next two years with the first installment payable on or before December 31, 1978. Interest on the balance due will be allowed pursuant to 28 U.S.C. § 1961, which directs that interest shall be calculated by state law. Under Ill.Rev. Stat. ch. 74 § 3, judgments against a school district are at the rate of 6% per annum. The School District may elect and should do so if financially possible, to accelerate payment.