**Alta CHRAPLIWY et al., Plaintiffs,**

v.

**UNIROYAL, INC. et al., Defendants.**

**Civ. A. No. 72S–243.**

United States District Court,
N. D. Indiana,
South Bend Division.

March 6, 1981.

Thomas R. Ewald, Washington, D. C., Thomas R. Fette, St. Joseph, Mich., R. Wyatt Mick, Jr., Mishawaka, Ind., for plaintiffs.

Harry N. Turk of Arthur, Dry & Kalish, New York City, Rody P. Biggert of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Timothy Woods of Jones, Obenchain, Johnson, Ford, Pankow & Lewis, South Bend, Ind., for defendants.

## MEMORANDUM

GRANT, District Judge.

### Introduction

The award of attorney fees in this case represents the final question in a suit that has continued for seven years. This litigation resulted in a settlement between the parties providing that defendant Uniroyal, Inc., (Uniroyal), pay 526 women in the plaintiff class $4,758,000 in cash, and approximately an equal amount in future pension benefits on account of unlawful sex discrimination in violation of Title VII of the Civil Rights Act of 1964. In addition to this monetary relief, Uniroyal must also reinstate 296 class members to active employment with full seniority, and improve the position of women workers generally through changes in the employment system at the defendant's Mishawaka plant.

As a further part of the settlement, Uniroyal agreed to pay plaintiffs' attorneys' fees in the "amount awarded" by the court, subject, of course, to any later appeal, as provided in Section 706(k), 42 U.S.C. § 2000e–5(k) which states:

> In any action or proceeding under this subchapter, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs. . . .

Petitioners are, of course, the prevailing parties within the meaning of Section 2000e–5(k). *See Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed. 2d 653 (1980).

It now becomes the duty of this Court to determine what is a "reasonable fee" within the meaning of Section 2000e–5(k). The reasonable fee must reflect the long history of this litigation, as well as a consideration of the congressional policies underlying Title VII.

### I. Factual Background

After passage of the Civil Rights Act of 1964 making sex discrimination unlawful, Uniroyal continued to maintain a segregated hiring and seniority system at its Mishawaka plant where women were heavily employed in the footwear production division, while other lines had predominately male employees. From 1968–1970, Uniroyal shut down its footwear production, while continuing its other production divisions, throwing a disproportionate number of women out of work. Despite the considerable plant seniority of many women employees, they were not given a chance to "bump" less senior male workers from other production lines.

In November and December of 1969, Uniroyal mailed a form letter to 260 laid-off

female employees notifying them that inasmuch as the prospects of their being recalled were "remote", the company was declaring their layoffs permanent and, as a result, was cutting off their supplemental unemployment benefits.

In January, 1970, Alta Chrapliwy and other female workers at the Mishawaka plant filed charges with the Equal Employment Opportunity Commission, (EEOC). The EEOC investigation found reasonable cause to believe discrimination had taken place, and after conciliation failed, the EEOC issued a right to sue letter.

### 1972–1974

On November 28, 1972, a complaint was filed by the 26 named plaintiffs as a class action on behalf of all female workers employed at Uniroyal's Mishawaka plant. Included as defendants were Uniroyal, Local 65 of the United Rubber Workers (Union), and the United Rubber Workers International. Uniroyal sought dismissal of this complaint, which was denied, and the plaintiffs began discovery proceedings with interrogatories and request for production of documents.

Although Uniroyal delayed its response, the Union complied with the discovery requests. Based upon this information, plaintiffs then drafted requests for admissions from Uniroyal. When Uniroyal failed to respond, plaintiffs filed a motion for sanctions and partial summary judgment on liability issues. The then active Judge of this Court, Judge George N. Beamer, deemed the requests for admissions to be admitted due to Uniroyal's continued failure to respond. It was this decision, in July, 1974, that established the company's general liability for sex discrimination. Uniroyal's motion to vacate this partial summary judgment was denied.

Following this, other requests for admissions detailing the discriminatory employment system were admitted by Uniroyal. Class action certification had previously been granted. Another plaintiffs' motion for partial summary judgment was pending when, on October 21, 1974, Judge Beamer

died. His death and the resultant vacancy on this Court delayed proceedings in the case. Uniroyal did not reply to the September, 1974 summary judgment motion until August, 1976. Although Uniroyal's violation of Title VII had been judicially determined, Uniroyal did nothing in the interim to provide relief for members of the plaintiffs' class.

### 1975–1976

In early 1975, plaintiffs began investigating Uniroyal's compliance status with Executive Order No. 11246. That Executive Order provides that federal contractors shall not discriminate against employees on the basis of their sex, race or other impermissible basis. In the event of noncompliance, the government contractor could be declared "ineligible" for any further contracts. The Secretary of Labor was given the power to enforce that Order and to order debarment, as well as the authority to implement such Order with appropriate federal regulations.

Uniroyal is one of the federal government's largest contractors, with approximately half a billion dollar's worth of Defense Department contracts during the 1969–1974 period. Each time it entered a federal contract, Uniroyal signed the required assurances of its compliance with the Executive Order.

Using the then recently enacted Freedom of Information Act, the plaintiffs discovered that the Interior Department had already conducted an on-site compliance review of defendant's Mishawaka plant in September, 1972, and found that Uniroyal was operating a segregated, discriminatory system of employment in violation of the Executive Order. The Interior Department had issued a deficiency letter, but Uniroyal had refused to change its practices, contending that since this Title VII suit was underway, the company was already defending itself against those same charges. The Interior Department then assured the company that it could take no further action while this litigation was still pending.

The plaintiffs then wrote the Secretaries of Labor, Defense and Interior in September of 1975 demanding that administrative action be taken against Uniroyal. The agencies responded by defending their "deferral" of any action. On October 16, 1975, the plaintiffs' attorneys filed suit in the United States District Court in Washington, D. C. for the Chrapliwy class members against the Secretaries of Labor, Defense and Interior. That complaint alleged that these officials were awarding contracts to Uniroyal in violation of their agencies' own regulations and sought enforcement of Executive Order 11246. *Chrapliwy v. Dunlop.* The plaintiffs sought a preliminary injunction. With court approval, the parties entered into a stipulation which provided that the officials would conduct a new compliance review of Uniroyal. The officials promised to enforce E.O. 11246 if Uniroyal was not in compliance.

Uniroyal was not a party in *Chrapliwy v. Dunlop* until February 27, 1976 when the plaintiffs moved to amend the complaint and join the company. This joinder was short-lived inasmuch as the district court granted the company's motion to dismiss, relying on decisions holding that the Executive Order does not create a private right of action against the employer.

Based upon the results of the compliance inspection that had been agreed upon in *Chrapliwy v. Dunlop,* the Department of Interior concluded that Uniroyal was still in violation of Executive Order 11246 and issued a show cause order requesting reasons why administrative action should not be commenced for cancellation of Uniroyal's federal contracts. Uniroyal sought a hearing and an order by the Director of the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) that "substantial issues of law and fact" existed and had to be resolved before administrative action could be taken. The Chrapliwy plaintiffs opposed the motion, relying upon Judge Beamer's July 5, 1973 summary judgment order. On May 4, 1976, the Director of the OFCCP issued an order which determined that "substantial issues of law and fact" did in fact exist and sug-

gested that the case be referred to the Department of Justice.

The plaintiffs opposed both OFCCP actions. The OFCCP Director reversed his decision to refer the case to the Department of Justice and thereupon issued a notice of intent to debar Uniroyal from government contracting, and commenced an administrative action against the company, *Department of Labor, OFCCP v. Uniroyal,* No. OFCCP-1977-1.

The Labor Department had no trial staff to conduct these proceedings, nor had they ever attempted to bar a major industrial corporation. In response to the needs of this case, the Solicitor of Labor hired a lawyer to assemble a trial staff to prosecute this case against Uniroyal.

Based upon these government actions, District Judge Pratt dismissed *Chrapliwy v. Dunlop* in September, 1974, and indicated that plaintiffs should exhaust their newly created remedies in the Labor Department's administrative proceedings. The *Chrapliwy* plaintiffs then intervened in the pending *OFCCP v. Uniroyal* case, along with defendant Rubber Workers Local Union 65.

In February, 1976, Uniroyal moved to dismiss this Title VII suit because of the pending OFCCP proceedings, which motion was denied. Uniroyal finally filed its response to plaintiffs' 1974 motion for summary judgment, along with a cross-motion for summary judgment. Reply briefs from both sides further delayed court decision in this matter.

### 1977–1978

At this point in the proceedings, Uniroyal asserted that the pretrial discovery procedures of the Labor Department were void and unconstitutional. One week prior to the Labor Department hearings on these matters, the Company's attorneys returned to this District Court seeking a declaratory judgment that the Labor Department rules for sanction hearings were void. After initially granting Uniroyal's motion for a temporary restraining order, this district court dismissed the complaint on August 15, 1977,

ruling that Uniroyal had not exhausted its administrative remedies. *Uniroyal, Inc. v. Marshall*, 20 FEP Cases 477 (N.D.Ind.1977). (Marshall I). The Company appealed the denial of an injunction, but the judgment was upheld by the Court of Appeals. *Uniroyal, Inc. v. Marshall*, 579 F.2d 1060 (7th Cir. 1978).

Due to the proceedings here in *Uniroyal v. Marshall (I)*, the start of *Department of Labor, OFCCP v. Uniroyal* was delayed from June to November of 1977. Uniroyal still had not answered the government's request for admissions and, consequently, the Administrative Law Judge ordered that these requests be deemed admitted. Plaintiffs filed motions in the OFCCP suit contending that Uniroyal's defense in that action should be stricken, based on the summary judgment proceedings in this case. The plaintiffs' attorneys attended the administrative hearings conducted by the ALJ in South Bend during the month of November. That case was taken under advisement, and on April 11, 1978, the ALJ issued his decision in *Department of Labor, OFCCP v. Uniroyal*, which recommended that the Secretary of Labor cancel, terminate, or suspend Uniroyal's existing government contracts and debar Uniroyal from future government contracts "until such time that it can satisfy the Director of Federal Contract Compliance (OFCCP) that it is in compliance with Executive Order 11246, and the Secretary of Labor's regulations issued pursuant thereto." The ALJ additionally recommended that further sanctions be imposed for Uniroyal's refusal to comply with the discovery regulations. All the parties filed exceptions to the recommended decision. The case was again taken under advisement, this time until June, 1979.

On May 31, 1977, this Court again considered summary judgment motions regarding Uniroyal's business necessity defense, and the company's cut-off of supplementary unemployment benefits to the plaintiffs. These issues were resolved in favor of the plaintiffs, *Chrapliwy v. Uniroyal, Inc.*, 458 F.Supp. 252 (N.D.Ind.1977), and defendant's motion for reconsideration of these issues was denied.

*1979–1980*

In Washington, Uniroyal had begun negotiations in an attempt to settle the OFCCP debarment action, retaining former New York City Mayor Robert F. Wagner to represent the Company. On June 25, 1979, however, the Chrapliwy plaintiffs filed a new action against the Secretary of Labor, complaining therein of the Secretary's failure to issue a final judgment confirming the ALJ's recommendations of the previous year. The plaintiffs also contended that the Secretary's inaction violated his predecessor's December, 1975 agreement in the *Chrapliwy v. Dunlop* case. The plaintiffs requested a district court order that the Secretary issue a decision in the OFCCP case. *Chrapliwy, et al. v. Marshall*, Civil No. 79–1647.

On the following day, all the interested parties met in a negotiating session. This group included plaintiffs' attorneys, the OFCCP staff, Uniroyal's lawyers, and the Solicitor of Labor. The Solicitor indicated that she would act as the Labor Department prosecutor in the OFCCP action, while other Department attorneys would advise the Secretary when he reviewed the ALJ's recommendations. The end result of this meeting was that the plaintiffs and Solicitor entered joint settlement negotiations with Uniroyal. Two days later, June 28, 1979, Secretary Marshall issued an extensive Decision and Administrative Order, canceling, terminating and suspending Uniroyal's present government contracts and declaring the Company ineligible for any new contracts. *Department of Labor OFCCP v. Uniroyal*, 20 FEP Cases 419 (1979). All of the Company's exceptions to the ALJ's decision were overruled in this decision. In response, on July 2, 1979, the Company filed a petition for review of the Secretary's decision with the district court, challenging the validity of the OFCCP pretrial discovery rules, and contending in the alternative that even if these rules were valid, debarment was too extreme a penalty for noncompliance. *Uniroyal v. Marshall,*

482 F.Supp. 364 (D.D.C.1979). These plaintiffs were allowed to intervene as defendants, while the Union intervened as a plaintiff. The defendants, in turn, filed for summary judgment and against the granting of a preliminary injunction sought by the Company and Union. These motions were denied, and the defendant's motion for summary judgment granted, in effect reiterating the Secretary's debarment order. The pretrial discovery procedures utilized by the OFCCP were declared to be valid, and the decision to debar Uniroyal for failure to comply with the discovery procedures upheld. *Uniroyal v. Marshall*, 482 F.Supp. 364 (D.D.C.1979). Uniroyal appealed this decision.

There was some disagreement whether Uniroyal was debarred on the merits of the substantive OFCCP charges that the Company had violated the Executive Order, or was caused by Uniroyal's refusal to obey the prehearing discovery procedures. District Judge Green's order interpreted the Secretary's decision to be based only on Uniroyal's failure on the procedural and discovery issues, and not on the merits of the sex discrimination issues.

Uniroyal, acting upon Judge Green's interpretation, entered negotiations with the Labor Department, seeking a consent decree that would reinstate Uniroyal if it complied with the discovery procedures. The plaintiffs' attorneys were not included in these discussions, despite the *Chrapliwy* plaintiffs' status as intervenors in *Labor Dept., OFCCP v. Uniroyal, Inc.* When they learned of these negotiations, they protested against such an agreement, seeking always to defend the plaintiffs' interests before the government officials. On September 7, 1979, these plaintiffs filed a cross-appeal in the U. S. Court of Appeals for the District of Columbia, challenging Judge Green's interpretation of the Secretary's order, and contending that the Secretary's order had included a finding on the substantive violation of the Executive Order. The consolidated appeals of the plaintiffs and Uniroyal were argued, and the case taken under advisement.

In the interim, Uniroyal offered the Labor Department documents, interrogatory answers and officials to depose. Uniroyal then requested that Judge Green compel the Labor Department to reinstate the company based upon this compliance with the discovery procedures. Judge Green asked the Secretary to reply in writing regarding his position with respect to Uniroyal's attempt to comply.

Despite these actions, time was running out for Uniroyal. By Thursday, October 18, 1979, Uniroyal was less than one week away from losing one of their largest federal contracts, leading the Company to begin serious settlement negotiations with the plaintiffs' and Labor Department's attorneys. After an intensive weekend of drafting and discussion, an Agreement of Settlement of this class action suit and a Memorandum of Understanding between the plaintiffs and the Department of Labor regarding a plan for distribution of the cash settlement were agreed upon by the parties. As previously stated, Uniroyal agreed to pay $4,758,000 in cash, provide pension benefits with a cash value of approximately $4,560,000 and reinstate 296 of the class members to the recall list with full seniority.

This Court gave its approval, and the settlement monies were distributed. Attorneys' fees were not agreed upon at the time of settlement, reflecting the professional responsibility concerns of conducting these discussions at the same time the client's recovery is being determined. *Prandini v. National Tea Co.*, 557 F.2d 1015, 1017 (3d Cir. 1977).

Since the final approval of the Agreement of Settlement, the *Chrapliwy* plaintiffs' attorneys have administered the cash settlement, pensions and reinstatement provisions. Questions regarding taxation obligations under the settlement have been resolved by the Court, while other issues have been resolved by the parties.

## II. *Method of Calculation*

Petitioners put forward two alternative theories of fee calculation, either one of which would result in an extremely large

fee award. The first theory is that the attorneys should be awarded a contingent fee equal to one-third of the entire financial recovery, including attorneys' fees, and they compute the fees on the contingency basis to be $4,658,510.[1]

In the alternative, petitioners contend that they have completed more than 11,000 hours of time that is properly billed to this case, and to the respondent Uniroyal, and that, at their normal hourly rate, the total bill for their services would amount to $1,510,768. They further contend that this amount should then be adjusted upward, to reflect the subjective criteria and factors authorized by *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1322 (7th Cir. 1974). Petitioners suggest that various multipliers be applied to the above figure to satisfy these factors. Specifically, they request a multiplier of 3.5 for the lead counsel, 2.625 for another attorney, and 1.75 for several others. Petitioners then compute that this alternative would entitle them to an award of $5,116,174, and for this reason they suggest that the lower contingent fee basis should be adopted.

The respondent replies that a contingency fee theory is totally inapplicable under Title VII, and, in any case, that the petitioners' proposed method of calculation is wholly incorrect. Instead, Uniroyal contends that the compensable hours of the plaintiffs' attorneys amount to only 6,408.5, and should be compensated at the South Bend hourly average rate for attorneys of equal experience. On this basis, they assert that the proper fee to be paid is $291,718, and that no upward adjustment should be made in this case.

The threshold question we encounter is: what is the proper method of computing this "reasonable fee"—by a contingency fee, an hourly rate, or an adjusted hourly rate?

The historical equitable powers of the federal bench to devise adequate remedies in the attorney's fee area has been sharply limited by the Supreme Court, which has held that fee authorizations should come from Congress, and not the judiciary. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). That authorization does exist in this case, along with the Court's admonition that the district judge should exercise sound discretion in setting an award that will effectuate the purposes underlying Title VII. *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). These purposes include, of course, encouraging workers to litigate bona fide cases of employment discrimination while represented by competent attorneys, all in an endeavor to spur the final dismantling of discriminatory practices in the workplace. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

The Seventh Circuit has not adopted any single approach to Title VII fee awards. All of the Circuit Courts of Appeals which have recently considered these issues have ruled that the most appropriate method of measuring attorney's fees is to calculate the allowable hours worked, and multiply this by a typical hourly billing rate to determine the "lodestar" figure. This lodestar is then subject to upward, or theoretically downward, adjustment based on a number of factors which include but are not limited to the difficulty of the legal issues, the skill of the petitioning attorneys, the quality of their work product, and the time limitations the representation imposed. *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 168–69 (3d Cir. 1973) (Lindy I); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir. 1976) (Lindy II) (en banc); *Merola v. Atlantic Rich-*

---

1. The named plaintiffs signed a written contingency fee agreement with the plaintiffs' attorneys early in this case. This agreement does not in any way influence this Court's decision as to what fee should be awarded. *Clark v. American Marine Corp.*, 320 F.Supp. 709, 711 (E.D.La.1970), *aff'd*, 437 F.2d 959 (5th Cir. 1971).

field Co., 493 F.2d 292 (3d Cir. 1974); City of Detroit v. Grinnell Corp., 560 F.2d 1093 (2d Cir. 1977); Grunin v. International House of Pancakes, 513 F.2d 114 (8th Cir. 1975). The Fifth Circuit adopted a slightly different approach, listing twelve factors they considered important for the trial court to consider. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).

The rulings in these circuits have most recently been adopted in Copeland v. Marshall, 641 F.2d 880 (D.C.Cir.1980), a Title VII case. This decision has made it clear that the lodestar method is the preferred method of determining a reasonable attorney's fee. Although the Seventh Circuit has not as yet adopted this approach, nothing in its past decisions would be at odds with this method of calculation. See Waters v. Wisconsin Steel Works of International Harvester Co., supra; Kamberos v. GTE Automatic Electric, Inc., 603 F.2d 598, 603–04 (7th Cir. 1979). The Copeland-Lindy approach has been used by other district courts, including some in this Circuit. See Jorstad v. IDS Realty Trust, 489 F.Supp. 1180 (D.Minn.1980); Liebman v. J. W. Petersen Coal & Oil Co., 63 F.R.D. 684 (N.D.Ill. 1974); Boggess v. Hogan, 410 F.Supp. 443 (N.D.Ill.1976).

The contingent fee theory has little to favor it in light of the congressional policies involved. One of these considerations is preventing against recoveries by a private attorney general, e. g. the petitioners, that is "so lucrative as to ridicule the public attorney general." Johnson v. Georgia Highway Express, Inc., 488 F.2d at 719. In this case, a contingent fee recovery has the propensity to create a windfall for the prevailing attorneys when a successful settlement or judgment is reached. While this may be an accepted part of our legal system in some respects, it has no place in statutorily authorized "reasonable fee" cases. This can easily be demonstrated by reference to those situations where the monetary relief is small, but Title VII plaintiffs are reinstated or given other equitable relief. Thus, in Causey v. Ford Motor Co. (M.D. Fla.1976), cited by petitioners, the plain-tiffs' back pay award was approximately $2,500 while the attorneys' fees approved were $20,000. In Copeland, supra, the plaintiffs received $33,000 in back pay, while the attorneys received $160,000 in fees. Cases where a district court has awarded a fee by simply taking a percentage of the recovery have become rare, and no examples of such a measurement in a Title VII case has been cited. In light of the judicial attention given attorneys' fees determinations in this decade, particularly the decisions culminating in Copeland, such a method cannot be utilized, however appealing its simplicity and ease of calculation. Technology Fund, Inc. v. Kansas City Southern Industries, Inc., 72 F.R.D. 433 (N.D.Ill.1976).

In a normal contingent fee case, payment is taken from the plaintiffs' actual recovery, rather than stacking another cost atop the payments already made by the defendants. The difference in source is only exacerbated when one considers that the plaintiffs here are seeking one-third of the total recovery, including attorneys' fees. This method does not result in a reasonable fee, and will not be considered here.

For these reasons, the fee in this case will be calculated by the method utilized in Copeland v. Marshall, supra, and the other cases previously cited. We believe that this method will effectuate the congressional policies underlying Title VII.

### III. Determining the Chrapliwy Lodestar Amount

By accepting that the petitioners' attorneys' fees must be calculated by the lodestar method, this Court has created a plethora of issues which must be addressed. We must first determine which of the hours can reasonably be charged to this proceeding and what hourly fees are appropriate. The cases hold that the court is itself an expert on the question of reasonable attorney's fees, and may consider its own knowledge and expertise to form an independent judgment as to the value of time spent on the litigation. Payne v. Travenol Laboratories, Inc., 74 F.R.D. 19, 21 (N.D.Miss.1976).

### III A. *Compensable Hours*

Petitioners have submitted time records and requested payment for more than 11,-000 hours. In its response, Uniroyal contends that this number of hours should be drastically reduced and cites six different reasons: *First,* and most significant in terms of the number of hours involved, Uniroyal contends that the petitioners' actions in seeking to have Uniroyal debarred from federal contracts for discriminatory practices are not compensable under the Title VII fee provision. Uniroyal has segregated 2,348.3 hours spent on these proceedings;[2] *Second,* Uniroyal contends that some of the hours petitioners are billing are attributable to its co-defendant, Local Union 65 of the United Rubber Workers, and should not be paid by Uniroyal; *Third,* Uniroyal requests that one-half of the time spent negotiating the final settlement, and its implementation, should not be compensated; *Fourth,* Uniroyal terms as "outrageous" the requested fee for time petitioners have spent as escrow agents for the settlement fund; *Fifth,* Uniroyal contends no payment should be made for time spent preparing the attorneys' fees petition; and *Sixth,* Uniroyal questions the payment of any portion of a fee for petitioners' travel time during the suit. Each of these issues will be discussed in turn.

### 1. *Debarment Procedures*

 Uniroyal contends that the petitioners should not be reimbursed for the hours spent pursuing the debarment of Uniroyal from federal contracts. Uniroyal has admitted that had the government not barred Uniroyal from Government contracts, they would not have settled this suit. Attorney Kalish, Uniroyal's chief negotiator, stated, in an affidavit attached to Uniroyal's brief: "It was definitely the loss of government contracts which forced Uniroyal to settle."

Therefore, Uniroyal is in the somewhat incongruous position of contending that the hours petitioners spent prodding and harassing the federal bureaucracy into action, which actually led to the settlement, should not be compensated. However, as a matter of law, the plaintiffs' attorneys cannot be reimbursed for these hours.

Several reasons dictate this decision, but, most importantly, the remedies of Title VII did not require nor encourage the plaintiffs to seek Uniroyal's contract debarment. The Title VII remedy existed at all times, and could have been utilized to bring Uniroyal to a settlement or judgment. In this case, the collateral proceedings may have been the proximate cause of the success achieved by the plaintiffs. Success alone, however, does not legitimize a request for fees regarding procedures that were not contemplated under Title VII's attorney's fee provisions. This is made amply clear by the wording of the attorney's fee statute and the cases which have interpreted it. Section 706(k) (42 U.S.C. § 2000e–5(k)) provides:.

> In any action or proceedings *under this subchapter,* the court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs." (emphasis added).

This section requires that the attorney's time and efforts be mandated by the Title VII statute, or by related and required procedures. The emphasized language makes it clear that the attorney's time must be within the Title VII procedure. The Executive Order utilized here cannot be transformed by legal alchemistry into such a proceeding.

The reach of the Title VII attorney fee provision was recently examined by the Supreme Court in *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980). *Carey* did not reach the

---

**2.** Uniroyal's segregation of the hours applicable to each particular topic has been utilized. Unfortunately, such an analysis suffers from a major deficiency. Where the plaintiffs' attorneys' time entry referenced more than one matter, the time involved was divided equally, albeit arbitrarily, between the topics. Despite this, there does not appear to be any satisfactory solution to this problem, other than requiring an expensive and burdensome breakdown of specific time entries. For this reason the Court will use the averaging approach stated above.

issue in this case, i. e., whether collateral proceedings with the same goal orientation, but not provided for under Title VII, can be compensated. *Carey* does, however, give a clear indication of just how far the Title VII attorney's fee provision can be stretched. In *Carey*, the Court sanctioned plaintiffs' attorneys' fees for all related state or other administrative proceedings, including any hearing before the Equal Employment Opportunity Commission (EEOC), or state and local agencies. In that case, the initial charge of discrimination was made to the EEOC, which then deferred action, referring the matter to the proper state administrative agency, a deferral required by Section 706(c). The EEOC eventually issued a right to sue letter, and a suit was filed in federal court, but it was voluntarily dismissed except for the attorney fee petition when a satisfactory settlement was achieved in the required state proceedings. The Court approved the payment of fees for those proceedings, noting:

> It is clear from this scheme of interrelated and complementary state and federal enforcement that Congress viewed proceedings before the EEOC and in federal court as supplements to available state remedies for employment discrimination. Initial resort to state and local remedies is mandated, and recourse to the federal forums is appropriate only when the State does not provide prompt or complete relief. See *Alexander v. Gardner-Denver Co.*, 415 U.S., at 48–50, 94 S.Ct., at 1019–1021, 39 L.Ed.2d 147.

447 U.S. at 65, 100 S.Ct. at 2031.

The various lawsuits filed in addition to the parent *Chrapliwy v. Uniroyal* claim are simply not mandatory procedures. Although the EEOC and Title VII do reflect the same goal orientation as the OFCCP and Executive Order No. 11246, i. e., ending discrimination in the work place, the two cannot be fused into one overarching mechanism. The OFCCP is charged with administering the contract compliance program, while the EEOC enforces Title VII. *Emerson Electric Co. v. Schlesinger*, 609 F.2d 898 (8th Cir. 1979). Although these agencies are allowed to cooperate and exchange information, their duties are distinct.

Furthermore, those cases which have addressed the issue have not found a private right of action implied by the Executive Orders pertaining to the discrimination area. *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3, 8–9 (3d Cir. 1964); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 633 (5th Cir. 1967). Although those cases did not discuss Executive Order 11246, the predecessor of this Order was considered. The gist of those holdings is that the Executive Orders are to be enforced by government administration, not private civil actions.

The court is aware that in this case the government agencies responsible for enforcing the Executive Order were slow in performing their statutory function. While they may perform more satisfactorily in the future, that is arguably a result of this litigation. As a product of the plaintiffs' determined prodding, a new OFCCP staff has been established to enforce Executive Order 11246 and this will be taken into account when the subjective quality adjustment is being considered.

Aside from the nature of the Executive Order, it would be inappropriate to charge Uniroyal attorney fees for cases to which they were not a party, or cases wherein the plaintiffs did not formally intervene. Uniroyal was not a party to *Chrapliwy v. Dunlop*, except for a very limited amount of time, nor in *Chrapliwy v. Marshall*. Likewise the plaintiffs were not a party to *Uniroyal v. Marshall.*

The steps plaintiffs took to seek Uniroyal's debarment were not unreasonable nor undesirable. This court scrupulously upheld the plaintiffs' right to make such an effort, characterizing it as follows:

> [B]y writing to the Federal agencies to inform them of alleged discriminatory practices in violation of Executive Order No. 11246, and by seeking an order to compel the appropriate agencies to bring Uniroyal's alleged discriminatory employment practices into compliance with Executive Order 11246, the plaintiffs' attor-

neys have attempted to diligently pursue a second available means of redress for their clients. Since Uniroyal engages in interstate commerce and receives Federal Government contracts, plaintiffs' attorneys have the statutory right to simultaneously pursue remedies under 42 U.S.C. 2000e et al., and Executive Order 11246. *Contractor's Assn. v. Secretary of Labor,* 442 F.2d 159 (3d Cir. 1971).

Moreover, the attempts of the plaintiffs' attorneys to secure relief for an alleged violation of Executive Order No. 11246 are protected by the First Amendment right to "petition the Government for a redress of grievances".

This does not, however, give this Court the equitable power to require the payment of attorneys' fees for these efforts. The *Carey* holding and language of Section 706(k) circumscribe the district court's ability to award payment for these hours. The Executive Order itself does not contain a private right of action nor, of course, any attorney's fee provision. Therefore plaintiffs' attorneys will not be compensated for these hours which were attributed to the debarment proceedings.

### 2. *Time Attributed to Union Liability*

█ Uniroyal contends that 265 hours of the time for which petitioners seek compensation should be charged to the defendant unions involved, Local Union No. 65 of the Rubber Workers and the parent International organization. The status of these defendants has not as yet been settled, and they did not contribute anything to the settlement fund which the plaintiff class received. The petitioners contend that they have removed all time entries that specifically relate to the Union's liability, and have billed only those hours which contributed to the case against Uniroyal. The record is clear that petitioners' discovery of materials controlled by the Union did have direct impact on this case, and contributed in establishing Uniroyal's liability. *Chrapliwy v. Uniroyal, supra,* 6 FEP Cases at 100. After reviewing these time entries, however, the Court finds that the majority do not pertain to Uniroyal's liability, but, rather, refer to Union defenses and Union liability. The Union must bear its share of the costs involved in this lawsuit, and inasmuch as the Union's liability and status have not as yet been determined, these costs cannot now be shifted to Uniroyal. Where a collective bargaining agreement violates Title VII, the costs of rectifying the discrimination should be shared by the employer and union. *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1381–82 (5th Cir. 1974). Similarly, it is even clearer that the costs of litigation should be apportioned to the parties in a case which establishes a Title VII violation.

### 3. *Time Attributable to Settlement Negotiations and Approval and Implementation of Settlement*

█ Petitioners seek compensation for 1,138 hours relating to the settlement negotiations, and 856.5 hours for the approval and implementation of the settlement with Uniroyal, with the representative plaintiffs, and with the Department of Labor. Uniroyal's sole contention is that the Government's claims were so inextricably linked to the plaintiffs' case that 50% of the negotiations were devoted to each set of claims, and, therefore, one-half of the time the petitioning attorneys spent should be excluded from compensation.

Uniroyal's position in this matter is without merit. It was Uniroyal's litigation strategy which placed the defendant in the unenviable position of having to settle in the eleventh hour contract debarment proceedings. Uniroyal cannot allocate petitioners' hours to the Department of Labor's monitoring and approval power. Uniroyal placed itself in a position where the settlement not only had to be satisfactory to the plaintiffs but to the Government as well. If attorney fees were incurred because of this linkage, the burden cannot be shifted to the petitioners.

The settlement negotiations are of a different nature than the hours spent on the debarment proceedings. These hours were expended in a direct attempt to resolve the Title VII lawsuit, and, for this reason they will be fully compensated.

### 4. Payment for Time Spent as Escrow Agent

The plaintiffs' lead attorney was appointed as escrow agent for the cash settlement fund which was paid directly to each plaintiff. Plaintiffs' attorneys carried out this task, distributing almost the entire $5,000,-000 cash fund within six weeks of Uniroyal's final settlement payment. As part of the payout, petitioners were required to negotiate with the various taxing authorities in order to withhold the proper amount of taxes from the payments to the class members. The plaintiffs' attorneys request payment for 129.9 hours for these services. Defendant points out that the agreement of settlement provides that the escrow agent "shall serve without compensation," and claims the petitioners' request for fees is in direct contradiction with the agreement of the parties. Defendant's position is that petitioners merely volunteered their time and should not be compensated for these hours.

■ The services of the petitioners, in administering and distributing the settlement fund, mixed their duties as attorneys and as escrow agent. The time spent necessarily benefited the plaintiff class in duties that had to be performed. While the escrow agent was not to be paid, the agreement cannot be taken out of context as the defendant urges to deny compensation to the petitioners. While they were not paid as escrow agents, the substance of this agreement does not preclude the petitioners being paid as attorneys for the necessary services rendered. They should be compensated for time spent upon these duties.

### 5. Preparation of the Attorney's Fee Petition

■ Petitioners request compensation for 581 hours devoted to preparing this fee application and supporting documentation.

Defendant contends that no fee, or a reduced fee, should be paid. Payment for time spent preparing an attorney's fee application was recently approved by the Seventh Circuit in *Bond v. Stanton*, 630 F.2d 1231 (7th Cir. 1980). Although that decision was based upon the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988, its reasoning is dispositive of the issue here.

Other Circuit Courts of Appeals which have considered this issue have reached similar results with respect to both Title VII and other Civil Rights Act attorney's fee statutes.[3] It reflects the congressional intent that plaintiffs have the counsel of attorneys to vindicate their rights, and to encourage attorneys to accept these cases. The work product of these hours is very helpful in assisting district courts to an informed determination of what are "reasonable fees." The petitioners' extensive briefs and appendices, as well as the defendant's response, have been very helpful in clarifying the numerous legal issues here involved. In light of *Bond v. Stanton*, there is no doubt these hours were reasonably spent and should be fully compensated.

### 6. Travel Time

■ Petitioners have requested payment for 558.70 hours travel time, of which 316.45 pertain directly to the *Chrapliwy* case. Defendant contends that no payment for these hours of travel should be made, relying upon *N. A. A. C. P. v. Bell*, 448 F.Supp. 1164, 1168 (D.D.C.1978), *rev'd on other grounds*, 609 F.2d 514 (1979). That case does not put forward any reason or authority to deny hourly compensation for time spent traveling.[4] The defendant also advances an alternative line of argument, contending that travel fees, if awarded, should be substantially reduced. In *Keyes v. School District No. 1, Denver, Colo.*, 439 F.Supp. 393, 409 (D.Colo.1977), a school de-

---

3. *Johnson v. State of Mississippi*, 606 F.2d 635, 638 (5th Cir. 1979); *Gagne v. Maher*, 594 F.2d 336, 343–44 (2d Cir. 1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Weisenberger v. Huecker*, 593 F.2d 49, 53–54 (6th Cir.), *cert. denied*, 444 U.S. 880, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978); *Prandini v. National Tea Co.*, 585 F.2d 47, 53 (3d Cir. 1978).

4. It does provide authority for a substantial hourly rate of $100.00 per hour for nontravel hours.

segregation case, the court awarded travel time of only one-half the approved hourly rate, while in *McPherson v. School District No. 186*, 465 F.Supp. 749 (S.D.Ill.1978), the award was two-thirds of the approved hourly rate. In view of the clearly articulated congressional policy of enabling plaintiffs to obtain capable legal counsel, it is appropriate to compensate petitioners at their usual hourly rates for travel time. This recognizes the reality that this time is valuable, even if an attorney cannot be totally productive while traveling. It will allow attorneys of special skill in managing Title VII litigation to provide their skills in areas not within their immediate geographical reach.

### 7. *Additional Hours*

■ The petitioners request payment for 565 additional hours allegedly devoted to the case since April 30, 1980, when the original time records were submitted to this Court. This time is related to the following issues:

(1) a reply brief on the attorney's fee issue as well as final preparation of the fee application.

(2) a dispute regarding pension benefits ultimately settled by agreement of the parties.

(3) a dispute as to the proper incidence of taxation relating to settlement monies which was decided by the Court.

(4) routine administration of the settlement.

While these hours are reasonably related to the case, compensation for these additional hours will be computed at the lower rate of $60.00 per hour.

### III B. *Reasonable Hourly Rate*

To determine attorneys' fees under the *Copeland* formula, the Court must determine the reasonable hourly fee to be charged for each of the plaintiffs' attorneys. Plaintiffs contend that their New York counsel has an hourly billing rate of $200 per hour, their Washington, D. C. lead

counsel, $175 per hour, while their two local counsel bill at $70 and $60 per hour, respectively. The seven other attorneys who assisted in this litigation claim hourly rates ranging from $50 to $175 per hour. Petitioners seek to have the lodestar figure computed by multiplying these hourly rates against the number of compensable hours. They contend that 1980 billing rates should be used since that will protect their income from the inflation which has occurred since 1973. Uniroyal, however, contends that these rates should reflect the fees charged at the time that the hours were worked.

1. *Locality Billing Rate or Rate Charged by the Attorney*

Defendant contends that the hourly payment to petitioners must conform to the customary rate in the South Bend area, not the fees charged in Washington or New York. Uniroyal's affidavits with regard to South Bend rates indicate that attorneys' fees ranged from a low of $35 per hour in 1973 to $85 per hour in 1980, depending, of course, upon the skill of the attorney involved.

Before considering the case law in this area, it should be noted that defendant has engaged similarly skilled and expensive counsel to represent its interests in this suit. Defendant has employed four major, nationally recognized, law firms, and forty-five attorneys in its spirited defense, for a total of 10,963 hours billed through July 22, 1980.[5] Uniroyal had its own $175 and $200 per hour attorneys, as well as $75 and $100 per hour attorneys, according to the 1980 billing rates. Presumably, these fees were received on a regular basis, without risk of nonpayment. On the other hand petitioners were not paid anything until this litigation was settled, and they might conceivably have come away with empty hands. Because of the overwhelming evidence of sex discrimination as practiced by Uniroyal, we do not consider plaintiffs' risk of failure, and the consequent loss of fees to petitioners, to have been very great. This will be more fully taken into account when the Court considers the subjective aspects of

---

**5.** Ascertained by answers to interrogatories propounded by plaintiffs' counsel.

the *Copeland* and *Waters* formulas, and deals with the contingency risk issue. More significantly at this juncture, the factual data indicates that the defendant's attorneys billed Uniroyal at hourly rates roughly comparable to the hourly wage sought here by these petitioners.

The congressional intent in allowing attorney's fees was, in part, to encourage individuals injured by discrimination to seek judicial review and to deter discrimination. Congress recognized, however, that this system would work only if the fee provided an incentive for competent lawyers to undertake such employment and to receive adequate compensation for the time they expend. *Piggie Park, supra*, 390 U.S. at 402, 88 S.Ct. at 966.[6]

This policy was also discussed in *Johnson v. Georgia Highway Express, Inc., supra*, 488 F.2d at 719–20, which stated:

> The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical burden of Title VII litigation. Adequate compensation is necessary, however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession.

■ The caliber of counsel here was equally matched. This is not the case of a small, relatively unsophisticated corporate defendant, suddenly faced with high priced counsel running up the clock at an exorbitant hourly rate. The rate on both sides reflects the price talented lawyers can command. It would not advance the congressional policies as interpreted by *Piggie Park, supra*, or *Johnson v. Georgia Highway Express, supra*, to arbitrarily limit plaintiffs' attorneys to the local billing rate when the defendant has utilized the resources of equally expensive, and presumably equally talented, attorneys. If Uniroyal had primarily used local counsel in its defense, it would have a far better argument in favor of restricting petitioners to the local billing rate. The plaintiffs' attorneys' billing rate must, of course, be balanced against the local billing rate to achieve the reasonable rate required by the statute. The legal profession no longer operates in a strictly local product market, and the attorney's fee provision of Title VII cannot be utilized to unrealistically tie the fees paid to the locality's wage scale.

The case law reflects the split between the two methods of calculating the hourly rate: local billing rates versus the attorney's usual billing rate. In *City of Detroit v. Grinnell Corp., supra*, 560 F.2d at 1102, the court allowed attorney fees of $125 and $100 per hour, stating:

> An award in such amount is not to be bestowed upon a lawyer representing a class simply on the basis of his having earned entrance into the legal profession. This should especially be avoided when such an amount becomes the foundation for superimposing fees of double and treble the "reasonable" amount, with the result becoming quite unreasonable.

In *Arenson v. Board of Trade of City of Chicago*, 372 F.Supp. 1349 (N.D.Ill.1974), the court allowed hourly fees ranging from $65 to $125 per hour, although the multiplier that was used raised these rates to $240 and $358 per hour.

In *Technology Fund, Inc. v. Kansas City Southern Industries, Inc., supra*, Judge Will allowed an hourly rate of $150 for the most senior partner appearing on behalf of the plaintiffs. This rate was justified due to the prominence and skill of the attorney involved. Judge Will also based his decision on the rates that lawyers routinely billed their clients.

Defendant cites several cases to support the position that hourly rates must be de-

---

**6.** *See also Copeland,* 641 F.2d at 891. The Civil Rights Attorney's Fee Award Bill of 1976, which is similar in language and principle to the attorney's fee provisions of Title VII also have recognized this. See *Copeland, supra,* at 897 and the dissent, footnotes 20–22 with citation to the House of Representatives and Senate Reports on the multiple purposes of the attorney's fees provisions.

termined in accordance with the hourly rate charged for similar services in the locality where the cause is heard. This is one of the factors set out by the Seventh Circuit in *Waters v. Wisconsin Steel, supra,* as well as *Johnson v. Georgia Highway Express, Inc., supra.* Neither case does more than mention this as one of the dozen factors to be considered, and neither instructs as to what should be done when a "specialist" from Washington or New York, with much higher fixed cost than local counsel, enters the case.

Defendant's position receives some support from the decision in *McPherson v. School District # 186, supra,* a case falling within the ambit of the Civil Rights Attorney's Fee Award Act. The Court began its analysis by acknowledging that there was no guidance from other decisions as to whether a national or local average should be used. The case was tried in Springfield, Illinois, while the successful plaintiff's counsel from Milwaukee and a consulting attorney from New York sought $100 per hour fees. Judge Ackerman rejected the New York rates in part, using Springfield's average as a base fee, and adjusting the rate upward depending on the skill and standing of the attorney involved. While $50 an hour was the rate for skilled attorneys in Springfield, fees of $60 per hour were granted for the New York attorneys.

In *Keyes v. School Dist. No. 1, supra,* the district court reduced the hourly rate claimed by a prominent Denver firm that enjoyed substantially higher billing rates than the area average. In *Payne v. Travenol Laboratories, Inc., supra,* the local billing rate was $35 per hour, and this figure was paid despite the $100 per hour billing rate of the plaintiff's lead counsel. These cases indicate that some balancing is required between the rate requested by the plaintiff's and the defendant's position.

2. *Present or Historical Billing Rates*

One additional problem has already been raised—i. e., should the hourly wages be paid at the billing rates that prevailed in 1972 or 1973 as defendant contends, or should the petitioners be paid at their 1980 billing rates to offset the inflation which has increased the price levels in effect six and seven years ago.

Petitioners point out that the Consumer Price Index for October, 1972, when this litigation began, was 126.6. In July, 1980, it was 248, indicating a consumer price increase of 95% in the last eight years, a fact of life of which everyone is painfully aware. Several large class action cases support petitioners' contention that current billing rates should be utilized to provide an equitable result.

In *Copeland, supra,* the court stated:

> Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage and adjustment to reflect the delay in receipt of payment therefore may be appropriate. *Lindy II,* 540 F.2d at 117.[23]

> [23] On the other hand, if the "lodestar" itself is based on present hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered, the harm resulting from delay in payment may be largely reduced or eliminated.

641 F.2d at 893.

Other cases support the proposition that present billing rates should be used. In *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395, 402 (D.D.C.1978), the Court stated:

> The rates used are based upon current normal rates, despite the fact that the services were provided over an eight-year period. This use of current rates simplifies the Court's task and roughly counterbalances the inflationary loss suffered by the attorneys because of the long delay in the recovery of their fees.

In another protracted lawsuit, which took seven years to complete, current billing rates were used. *City of New York v. Darling-Delaware,* 440 F.Supp. 1132, 1134

(S.D.N.Y.1977). The court stated: "Where the attorneys have waited so long for any compensation, it seems that a calculation at present rates is appropriate to compensate for loss of interest or inflation."

On the other hand, some district courts have used the historical rates at which attorneys had billed in the past, rather than present billing rates. *Imprisoned Citizens Union v. Shapp*, 473 F.Supp. 1017 (E.D.Pa. 1979). While others have used the historical rates, they have then increased the contingency multiplier to reflect the lower value resulting from the historic rates. *In re Equity Funding Corp. of America Securities*, 438 F.Supp. 1303, 1331 (D.C.Cal.1977) (case lasted four years); following *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 117 (3rd Cir. 1976); *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 552 (S.D.N.Y.1979). In *Aamco Automatic Transmissions v. Tayloe*, 82 F.R.D. 405 (E.D.Pa.1979), historic billing rates were used, but the court awarded a modest "bonus" to compensate for the long delay in obtaining payment. Policy considerations indicate that to the extent historical rates were based on costs of overhead and services paid for at the time, adjustment by using current billing rates could result in a windfall for plaintiff's attorneys. A. Miller, Attorney's Fees in Class Actions (Federal Judicial Center 1980).

All of the varied policy concerns discussed must be taken into account during a period of escalating inflationary pressures. It should be recognized that the higher current rates reflect the considerable increase that inflation has wrought over the eight year period involved in this long case, an increase that has accelerated during the final months since the debarment proceeding prodded Uniroyal to accept a final settlement in this case.

As stated above, the district court in *In re Ampicillin Anti-Trust Litigation, supra*, indicated three years ago that the use of what were then current normal rates "roughly counterbalances the inflationary loss suffered by the attorneys because of the long delay in the recovery of their fees." 81 F.R.D. at 402. The *Copeland* court also recognized that fact. This is very heavily impressed upon the Court as we weigh the several factors discussed above.

Administratively, the Court would be hard pressed to assess the proper hourly rate the attorneys of differing skills and experience should be paid for their work during each of the eight years this litigation continued. The various rates the Court has adopted reflect the interrelationship of the lodestar analysis. If current rates were not used, the amount awarded for the subjective risk and quality factors would have been greatly increased. For all these reasons, the use of current billing rates will be utilized.

| ATTORNEY | RATE REQUESTED | DEFENDANTS PROPOSED RATE | RATE ALLOWED | HOURS REQUESTED | HOURS TO BE COMPENSATED | LODESTAR FIGURE |
|---|---|---|---|---|---|---|
| EWALD | 175 | 60–85 $ | 75 | 6,324.8 | 4,552.7 | $341,452.50 |
| BLUMROSEN | 200 | 60 | 75 | 427.2 | 248.1 | 18,607.50 |
| FETTE | 70 | 60 | 50 | 2,844.5 | 2,562.4 | 128,120.00 |
| MICK | 60 | 60 | 50 | 1,086.3 | 1,008.8 | 50,440.00 |
| FRUM | 110 | 60 | 50 | 301 | 41.4 | 2,070.00 |
| SEYMOUR | 175 | 60 | 75 | 48.5 | 43.4 | 3,255.00 |
| GINSBURG | 125 | 60 | | 29.7 | 0 | |

| ATTORNEY | RATE REQUESTED | DEFENDANTS PROPOSED RATE | RATE ALLOWED | HOURS REQUESTED | HOURS TO BE COMPENSATED | LODESTAR FIGURE |
|---|---|---|---|---|---|---|
| RYAN | 80 | 40 | 50 | 31.5 | 31.5 | $ 1,575.00 |
| BENT | 50 | 50 | 50 | 40.6 | 40.6 | 2,030.00 |
| GAUTIER | 50 | 50 | 50 | 25.5 | 25.5 | 1,275.00 |
| PASSARO | | | 50 | 19.2 | 19.2 | 960.00 |
| SUB–TOTAL | | | | 11,178.8 | 8,573.6 | 549,785.00 |
| ADDITIONAL HOURS SINCE 5/1/80 | | | $60 | 565. | 565. | 33,894.00 |
| TOTAL | | | | | | $583,679.00 |

## IV. Subjective Considerations for Adjusting the Lodestar Figure

A concomitant of rejecting the petitioners' contingent fee theory is an acceptance that the "lodestar" figure arrived at by multiplying hours times rate, may be adjusted upward or downward based on the more subjective criteria announced in *Waters, supra*. For example, in *Kamberos v. GTE Automatic Elec., Inc., supra*, the court approved a twenty-five per cent increase of the lodestar figure in a routine Title VII action.

 The court in *Jorstad v. IDS Realty Trust, supra*, adopted the subjective considerations expressed in *Lindy Brothers, supra*, which included two broad categories: the risk of non-recovery, and quality of the attorney's work, and awarded specific dollar amounts for each of these categories.[7] Each of these cases dealt with securities violations. The Seventh Circuit has indicated in a previous Title VII case that a decision on attorney fees should take into account all of the factors in the ABA Code of Professional Responsibility, Disciplinary

Rule 2–106. *Waters v. Wisconsin Steel Works of Int. Harvester Co., supra*, 502 F.2d at 1322. Some of these Rule 2–106 factors overlap, and each factor can be allocated to either the risk or the quality issues. For this reason the Court will briefly state the findings of fact with respect to each of the applicable *Waters* factors, and award the appropriate adjustments to the lodestar figure on the basis of the risk involved, and the quality of the representation provided by the petitioners.

In assessing the risk of non-recovery and the quality factor, the hours reasonably spent on the case after the settlement are not taken into account. Those hours were not at risk, and were fully compensated for by the payment of the regular hourly wage. For this reason the total number of hours worked under the risk of non-recovery is approximately 7,300 hours.

### A. The Risk of Non-Recovery

The award must take into account that some of these cases are lost. As stated in

---

**7.** The court awarded $800,000 for the risk factors, and $800,000 for the quality of the work performed on the merits of the case. The base fee for hours spent on the merits totaled $545,-609.50. The hourly rate the attorneys were paid ranged from $125 to $60 per hour. In addition, fees of $226,558 were granted for time spent on the fee application, with a further $225,000 paid for the risk factor in the attorneys' fee application. The sum of the fee award was $2,597,167.75, with an additional $124,482.65 in expenses being paid.

*McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967):

> The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services. Charges on the basis of a minimal hourly rate are surely inappropriate for a lawyer who has performed creditably when payment of any fee is so uncertain.

*See also, Dolglow v. Anderson*, 43 F.R.D. 472, 494 (E.D.N.Y.1968).

Uniroyal argues that no contingency risk of non-recovery existed after the July, 1973 partial summary judgment in favor of the plaintiffs. The history of this litigation, however, indicates that this contention is without merit. Uniroyal did not surrender after the 1973 summary judgment, nor after any further order building upon that finding of liability, but, rather, continued to file motions attacking this Court's jurisdiction, asserted novel business defenses, and at one point sought sanctions against the petitioners as well as dismissal of this suit. No ground was surrendered without a struggle, and Uniroyal litigated each issue in this case until the debarment proceeding commanded a final settlement. However, Uniroyal's violation of the sex discrimination laws might suggest that no real risk of non-recovery ever existed here.

As Judge Rubin noted in *Perkins v. New Orleans Athletic Club*, 429 F.Supp. 661, 667 (E.D.La.1976): "Those who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into account the time and effort they exact from their opponents." It was Uniroyal's right to contest every aspect of this claim, but they cannot now disclaim the consequences of their actions.

Uniroyal relies upon several cases wherein plaintiffs' attorneys were virtually assured of being paid for their efforts in the litigation. A comparison of the facts in these cases with this litigation shows how inappropriate such an analogy would be. For example, in *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624 (6th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2999–3000, 64 L.Ed.2d 862 (1980), the decision not only noted that the legal issues were not novel, but stated: "[W]e do not believe there was a very fair chance that the plaintiffs would wholly fail to prevail." In *City of Detroit v. Grinnell, supra*, the plaintiffs filed suit after the government had already succeeded in proving an antitrust violation. The government's findings of fact and conclusions of law were incorporated in the class complaint. It is not surprising that these circumstances led the appellate court to reduce the threefold multiplication of the lodestar figure. In contrast, these Chrapliwy plaintiffs supplied the government with the raw materials of its case in this litigation. Unlike *Northcross* or *Grinnell* where only a portion of the time spent in the case was taken under the risk of non-recovery, Uniroyal's tenacious and skilled defense of its position always left an element of doubt as to the conclusion of this litigation, despite the discrimination which occurred. This is supported by Uniroyal's affidavits, which indicate that this suit was settled only because of the threatened federal debarment. The entire suit was conducted with some risk of non-recovery until the settlement was reached in October, 1979.

1. *The Novelty and Difficulty of the Legal Questions Involved and the Skills Exhibited in the Resolution of these Problems*

Another portion of the overall risk of non-recovery is an assessment of the difficulty of the legal and factual issues the petitioners faced and how they were overcome. Uniroyal contested every aspect of this lawsuit, from discovery disclosures to the substantive law of fair employment practices. The company's stubborn defense forced the plaintiffs into strenuous efforts to advance their case. From the viewpoint of judicial economy, the petitioners utilized an extremely economical method of proof, relying upon well documented and carefully detailed requests for admissions and inter-

rogatories. This avoided a burdensome trial using these materials, which would have been difficult to manage, time consuming, and due to the staggering volume of material, possibly unintelligible. This somewhat plodding but certain method of proof saw the plaintiffs prevail each time summary judgment was requested, despite Uniroyal's vigorous defense.

Managing a large class action is never an easy task, but maintenance of this class action was difficult, and required the constant attention of the petitioners. The length of time the suit was pending, combined with the continual rumors of Uniroyal's demise, led to "opt outs" by members of the plaintiffs' class. The issue of settling class membership was heavily litigated, with Uniroyal's contention that continued opt outs be allowed finally being settled by the Court.

In February, 1976, Uniroyal sought dismissal of this case and contempt sanctions against the plaintiffs and their attorneys, claiming that these petitioners had violated this Court's order restricting communications with the plaintiff class, and, further, had violated the ABA's Code of Professional Responsibility. Both issues were resolved against Uniroyal. *Chrapliwy v. Uniroyal*, 71 F.R.D. 461, 12 FEP Cases 1664 (N.D.Ind.1976).

In summary, it is clear that had the petitioners faltered in any respect with the difficult legal issues faced, they could have lost their case, or have been placed in a much weaker position for settling the claim.

2. *Time Limitations Imposed by the Litigation*

There must have been periods during the past seven years when the petitioners could have done nothing but work on *Chrapliwy* and its progeny. These periods include October and November of 1972, when the plaintiffs began preliminary investigations with the ninety day EEOC statute of limitations requiring quick action; the period proceeding the discovery deadline of June 1, 1974; the period immediately prior to the filing of each summary judgment motion;

and the final months of this litigation, from June till October, 1980. These time limitations circumscribed the practice of the attorneys in this case, although this restriction is offset by the fact that the plaintiffs will now be paid for these hours.

Defendant contends that *Kamberos v. GTE Automatic Electric, Inc., supra*, is authority for rejecting any claim for increased compensation based on time limitations. That case is inapposite. The attorneys in that case worked 268 hours over a *six* year period, indicating that there were no "time limits" imposed on the petitioners' practice. As these findings indicate, that is not the situation faced here.

B. *Quality*

1. *The Experience, Reputation and Ability of the Lawyers Performing Services*

In deciding attorney's fee awards, other courts have considered the experience, reputation and ability of the lawyers.

*Waters v. Wisconsin Steel Works of International Harvester Co., supra; Johnson v. Georgia Highway Express, Inc., supra; Arenson v. Board of Trade of City of Chicago, supra; Jorstad v. IDS Realty Trust, supra.*

These criteria have, to some degree, been computed in the hourly rate since a skilled and experienced attorney commands a higher hourly rate than a neophyte who lacks trial experience. *Wehr v. Burroughs*, 477 F.Supp. 1012 (E.D.Pa.1979). With this caveat in mind, there are some comments that should be made on the quality aspect of the attorneys' involvement.

Overall, the petitioners brought to this litigation a more than adequate command of trial advocacy techniques, particularly those required to manage a large Title VII action. It is not necessary to discuss each lawyer who took part and state his past experience and the skills exhibited here. It is sufficient to state that the petitioners who were not drawn from this area had a strong background in fair employment litigation, particularly in Title VII cases. The local counsel, from Michigan and Indiana,

also brought a record of trial experience to the plaintiffs' team, and exhibited these skills, while assisting in the difficult job of managing this lawsuit.

The ability of these attorneys is further demonstrated by their success when opposed by talented, nationally recognized law firms. Uniroyal utilized a leading local law firm, one of the nation's noted management-industrial relations firms, corporate counsel, and other skilled negotiators on its behalf. From this, the Court concludes that the level of experience, reputation, and ability of the attorneys supports some upward adjustment of the "quality" aspect of this fee award.

### 2. Results Obtained

Any inquiry into the quality of the representation must take into account the fourth factor enumerated in *Waters v. Wisconsin Steel Works of International Harvester Co.,* *supra,* the amount involved and the results obtained.

In *Swanson v. American Consumer Industries, Inc.,* 517 F.2d 555, 563 (7th Cir. 1975), the court stated:

> The amount that an attorney can expect to receive as a fee for prosecuting a case ... is necessarily related ... to the amount actually recovered. It is also related in some degree to the amount that could realistically have been hoped to be recovered.

*Accord, Williams v. General Foods Corp.,* 492 F.2d 399, 409 (7th Cir. 1974).

In this case, the amount recovered must also take into account the equitable relief obtained. In *Copeland,* it was stated:

> It is important again to emphasize that a huge dollar recovery does not itself justify a huge fee award. The "lodestar" itself generally compensates lawyers adequately for their time. An upward adjustment for quality is appropriate only when the attorney performed exceptionally well, or obtained an exceptional result for the client. For example, if a substantial monetary judgment was to be *expected,* that expectation normally is reflected in the hourly rate used to compute

the "lodestar," and no further adjustment would be necessary.

641 F.2d at 894 (emphasis in original.)

Acknowledging the results obtained would not be complete without recognizing the impact of this lawsuit on the Department of Labor. The actions by the plaintiffs' attorneys forced the Labor Department to create a working enforcement system to implement Executive Order 11246, and police other federal contractors in their compliance with its procedures. This mechanism will continue to operate, vindicating the rights of other employees and effectuating the congressional intent behind both Title VII and the Executive Order.

The magnitude of the financial recovery is not a determinative factor, merely one to be considered by the Court. The large amounts involved do not add to the complexity of the problems, increase the responsibilities or require greater capabilities of counsel. Petitioners request $1.5 million as the proper quality adjustment. They justified this figure by contending that their hourly rate multiplied by the number of hours is approximately $1.5 million. The petitioners also suggest that if the court is unpersuaded by that contention, the smallest quality adjustment should be $475,800, a figure calculated by taking 10% of the immediate cash recovery obtained, $4,758,000. Defendant Uniroyal contends that no quality adjustment should be paid. They argue that the government, not the petitioners, forced the large settlement.

## CONCLUSIONS

█ For the reasons previously stated, and in light of the Court's evaluation of the proper hourly rate and compensable hours, the Court now awards the following amounts: For the overall risk of nonrecovery, $50,000, and for the quality of the representation, $200,000. These amounts will be added to the lodestar figure of $583,679 established in Part III of this order, for a total of $833,679, a total fee which we believe is reasonable in light of all the factors involved.

Borrowing from Judge Bauer in *Arenson v. Board of Trade of City of Chicago, supra,* 372 F.Supp. at 1359, this award, "is meant to adequately compensate them for initiating this significant litigation and negotiating such a beneficial settlement... ; yet ... this award is not meant to provide a windfall to the plaintiffs' attorneys."

At the hearing on attorneys' fees, the petitioners' lead counsel advised the Court that payment of this fee could be made in a lump sum to all of the attorneys involved. With this in mind, the Court's breakdown of the fees may be considered advisory, and final distribution is left to the discretion of the attorneys involved.

One final note is required before closing. Defendant Uniroyal requested and was granted three months' additional time to answer the petition for fees. When the hearing was held on this application, it was obvious that sorting out the legal theories and facts involved would take a substantial amount of time, even if this decision is not appealed. Defendant Uniroyal has admitted liability for fees of at least $290,000, and, at a hearing on the matter of these fees, counsel for defendant accepted the Court's suggestion that an interim payment of $300,000 be made at that time to the petitioners. That payment was made, without any prejudice to Uniroyal's rights in this matter, and that sum of $300,000 should be set off against the total amount of fees herein awarded the attorneys for plaintiffs. After credit is given for that interim payment of $300,000, the net amount now due petitioners is $533,679. Judgment will be entered for that amount.

So Ordered.